CASE 8.—PROSECUTION AGAINST PETER CAMPBELL FOR VIOLATING A CITY ORDINANCE.—March 24, 1909.

## Commonwealth v. Campbell

Appeal from Jessamine Circuit Court.

J. M. BENTON, Circuit Judge.

Defendant acquitted and the Commonwealth appeals—Affirmed.

1. Intoxicating Liquors—Legislative Powers.—Under Const. Sec. 59, subsection 27 and Id. Secs. 61, 154, requiring the General Assembly to provide a general local option law for counties, cities, etc., and authorizing it to prescribe necessary laws for the prohibition of the sale of intoxicating liquors on election days, etc., the Legislature is without authority to prohibit a citizen from having in his possession intoxicating liquors for his own use, though it has power to regulate the sale of liquor or any other use of it which in itself is inimical to the public health, morals, or safety.

Commonwealth v. Campbell.

2.  Constitutional Law—Police Power—Right to Invade Privacy.—
    The Legislature cannot invade the privacy of a citizen's
    life, and regulate his conduct in matters in which he alone
    is concerned, or prohibit him any liberty the exercise of
    which will not directly injure society.
3.  Intoxicating Liquors—Municipal Regulation—Validity.—A city
    clothed with the police power possessed by the General As-
    sembly and prohibiting the sale of intoxicating liquor within
    its limits cannot prohibit one from having in his possession
    within the city, intoxicating liquors for his own use.

EVERETT B. HOOVER, JAS. BREATHITT, Attorney General,
and TOM B. M'GREGOR, Assistant Attorney General, for ap-
pellant.

JOHN H. WELCH for appellee.

OPINION OF THE COURT BY JUDGE BARKER—Affirm-
ing.

The appellee, Peter Campbell, was arraigned be-
fore the police court of Nicholasville (a city of the
fourth class) under the following warrant: "Nichol-
asville Police Court. The Commonwealth of Ken-
tucky, to the Chief of Police of Nicholasville, or to
any Sheriff, Coroner, Jailer, Marshal or Policeman in
this State: You are commanded to arrest Pete
Campbell and bring him before the Nicholasville po-
lice court to answer to the charge of said Common-
wealth (which sues for the use and benefit of the
board of councilmen of the city of Nicholasville) of
a breach of the ordinance of said city, to-wit: Bring-
ing into the town of Nicholasville spirituous, vinous
or malt liquors upon his person or as his personal
baggage exceeding a quart in quantity, committed by
him in said city on or before the 19th day of Febru-
ary, 1908. Given under my hand as judge of said
court, this 19th day of February, 1908, John Tray-
nor, J. N. P. C." He was tried and found guilty in
the police court, and a fine of $100 assessed against
him. Upon appeal to the Jessamine Circuit Court, the
judgment of the police court was reversed, and the
warrant dismissed. From this judgment the Com-
monwealth has appealed.

The ordinance, by virtue of which the warrant was issued, is as follows:

"An ordinance to regulate the carrying, moving, delivering, transferring or distributing intoxicating liquors in the town of Nicholasville.

"Be it ordained by the board of councilmen of the town of Nicholasville:

"(1) It shall be unlawful for any person or persons, individuals or corporations, public or private carrier to bring into, transfer to any other person or persons, corporations, carrier or agent, or servant, deliver or distribute in the town of Nicholasville, Kentucky, any spirituous, vinous, malt or other intoxicating liquor, regardless of the name by which it may be called; either in broken or unbroken packages, provided individuals may bring into said town, upon their person or as their personal baggage, and for their own private use, such liquors in quantity not exceeding one quart.

"(2) Each package of such spirituous, vinous, malt or other intoxicating liquor, regardless of the name by which it may be called, whether broken or unbroken packages, brought into and transferred to other person or persons, corporations, carrier or agents, or servants, delivered or distributed in said town shall constitute a separate offense.

"(3) Any person or persons, individual or corporation, public or private carrier violating the provisions of this ordinance shall be fined not less than $50 nor more than $100 for each offense.

"(4) Provided the provisions of this ordinance do not apply to interstate commerce carriers when engaged in interstate commerce transportation.

"(5) This ordinance shall take effect and be in force from and after its passage and publication.

"Approved this 7th day of February, 1908.

"W. L. Steele, Mayor."

The following subsections of section 3490, Ky. St. (charter of cities of the fourth class), are referred to in the briefs of counsel as having a bearing upon the question in hand:

"The board of council shall have power * * * within the city—

"(1) To pass ordinances not in conflict with the Constitution or laws of this State or of the United States, and to impose and collect license fees and taxes on stock used for breeding purposes, and on all franchises, trades, occupations and professions."

"(7) To prevent and remove nuisances at the cost of the owners or occupants, or of the parties upon whose ground they exist, and define and declare by ordinance what shall be a nuisance within the limits of the city, and to punish by fine any person for causing or permitting a nuisance."

"(27) The council shall have power, by ordinance, to license, permit, regulate or restrain the sale of all kinds of vinous, spirituous or malt liquors within the limits of the city, or to restrain or prohibit the sale thereof within one mile of the limits thereof, provided nothing herein shall be construed as granting the power or right to one town or city to license, permit, regulate, restrain or prohibit the sale of vinous, spirituous or malt liquors in any other town or city, and may fix the penalty or fine for violation of an ordinance under this section at any sum not exceeding one hundred dollars; provided, that no license to sell such liquors, to be drunk on the premises where sold, granted under this section, shall be for a less amount than two hundred and fifty dollars nor for a greater amount than one thousand dollars, For license to sell same by retail, for medical purposes, they may charge not less than fifty dollars nor more than five hundred dollars. For license to sell same by retail in quantities not less than a quart they may charge not less than one hundred dollars nor more than five hundred dollars. The board of coun-

cil shall, at any time, have the power and authority to refuse to grant any license, and to suspend or revoke any license granted under or by virtue of the authority conferred by this section, when the board shall deem it necessary so to do in order to preserve the peace or good morals of said town, and said board of council shall be the exclusive judges of the necessity.''

''33. Said city council shall have legislative power to make by-laws and ordinances for the carrying into effect of all the powers herein granted for the government of the city, and to do all things properly belonging to the police of incorporated cities. Said board of council may change the boundary line of any ward or wards of any city now divided into wards, or hereafter divided into wards, under the provisions of this act, not less than sixty days previous to any November election.''

It will be observed that the warrant issued against the defendant charges him with bringing into the town of Nicholasville spirituous, vinous, or malt liquors, upon his person or as his personal baggage, exceeding a quart in quantity. So far as the warrant is concerned therefore there is nothing to negative the idea but what the defendant had the liquor for his own use, and for no other purpose. We presume it will not be controverted that, if the council of Nicholasville could limit the quantity of liquor which a person might have in his possession for his own use to a quart, it could prohibit his having in his possession any quantity whatever. We are confronted therefore with the proposition as to whether or not, in this State, it is competent under the police power for any legislative body to prohibit the possession or use of liquor by one for his own necessity or comfort. Broadly stated, the question before us is whether or not it is competent for the Legislature to prohibit a citizen from having in his own possession spirituous liquor for his own use. It will not require

any elucidation to show that, if the citizen may be prohibited from having liquor in his possession, he can be prohibited from drinking it, because, of necessity, no one can drink that which he has not in his possession. So that if it is competent for the legislative body of any given city or district, or even the Legislature of the State, to prohibit the citizen from having liquor in his own possession, then a new and more complete way has been discovered for the establishment of total prohibition, not only in any precinct, town, or county, but throughout the State, because, if it is competent to prohibit the citizen from having liquor in his possession, it necessarily follows that he can neither sell nor use it; as it is a physical impossibility to do either without first having had the possession of the interdicted liquor.

When the constitutional convention was in session, it was confronted with the question of how the use of spirituous liquor should be regulated. There were two forces brought strongly to bear upon the convention: First, there were the prohibitionists, who desired to facilitate and advance in every way the means of banishing liquor from the State; and on the other hand, there were those who were engaged in the business of manufacturing and selling liquor, who strongly advocated the utmost freedom of the citizen with reference to its use. The convention gave patient and full hearing to both parties to this controversy, and, as a result, formulated a system by which the sale of vinous, spirituous, or malt liquors throughout the State was to be regulated by general laws. By subsection 27 of section 59 of the Constitution, it is provided that the General Assembly shall not pass local or special acts to provide a means of taking the sense of the people of any city, town, district, precinct, or county, whether they wish to authorize, regulate, or prohibit therein the sale of vinous, spirituous, or malt liquors or alter the liquor laws. And by section 61 it is provided that

the General Assembly shall, "by general law, provide a means whereby the sense of the people of any county, city, town, district or precinct may be taken, as to whether or not spirituous, vinous or malt liquors shall be sold, bartered or loaned therein, or the sale thereof regulated. But nothing herein shall be construed to interfere with or to repeal any law in force relating to the sale or gift of such liquors. All elections on this question may be held on a day other than the regular election days." Section 154 is as follows: "The General Assembly shall prescribe such laws as may be necessary for the restriction or prohibition of the sale or gift of spirituous, vinous or malt liquors on election days." It will thus be seen that the Constitution prescribes fully the power of the Legislature with reference to the regulation of liquor. The General Assembly is given ample power by general laws to submit to the people the question of whether or not any given district shall have prohibition, and by section 154 they are authorized to prohibit either the sale or gift of liquor on election days.

Now, can it be contended with any show of reason that the framers of the Constitution intended to leave the question of the retailing of liquor in a given district to a vote of the majority of the qualified voters in the district, and yet leave it in the power of the Legislature upon its own motion to prohibit the possession of liquor by the citizen? Before the present Constitution, it was competent for the Legislature to prohibit the sale of liquor by retail in any county, town, or district without any vote being taken by the citizens, or without giving them any voice in the matter; but no one doubts that, under the present Constitution, it is not competent for the Legislature, without a vote of the citizens, to declare the retailing of liquor in any part of the state unlawful. How vain it would be, then, for the framers of the Constitution to thus take from the Legislature the power to regu-

late the retailing of liquor and place that question within the competency of the qualified voters, and yet leave within the competency of the Legislature the greater power of prohibiting the citizen either from possessing liquor or using it for his own benefit or comfort. It is self-evident that, if the Legislature may pass a general law prohibiting any citizen from possessing or using liquor in any quantity, this would in itself be the most perfect prohibition law possible, because no man could retail without first having possession of it. We cannot believe that the framers of the Constitution intended to thus carefully take from the Legislature the power to regulate the sale of liquor, and at the same time leave with that department of the state government the greater power of prohibiting the possession or ownership of liquor.

The fact that the Constitution, by section 154, leaves with the General Assembly the power of restricting or prohibiting the sale or gift of liquor on election days, clearly shows that the convention had it in mind that but for this special power the Legislature could not even regulate the sale of liquor on election days. The history of our state from its beginning shows that there was never even the claim of a right on the part of the Legislature to interfere with the citizen using liquor for his own comfort, provided that in so doing he committed no offense against public decency by being intoxicated; and we are of opinion that it never has been within the competency of the Legislature to so restrict the liberty of the citizen, and certainly not since the adoption of the present Constitution. The Bill of Rights, which declares that among the inalienable rights possesed by the citizens is that of seeking and pursuing their safety and happiness, and that the absolute and arbitrary power over the lives, liberty, and property of freeman exists nowhere in a republic, not even in the largest majority, would be but an empty sound if the Legislature could prohibit the citizen the right of owning or drink-

ing liquor, when in so doing he did not offend the laws of decency by being intoxicated in public. Man in his natural state has a right to do whatever he chooses and has the power to do. When he becomes a member of organized society, under governmental regulation, he surrenders, of necessity, all of his natural right the exercise of which is, or may be, injurious to his fellow citizens. This is the price that he pays for governmental protection, but it is not within the competency of a free government to invade the sanctity of the absolute rights of the citizen any further than the direct protection of society requires. Therefore the question of what a man will drink, or eat, or own, provided the rights of others are not invaded, is one which addresses itself alone to the will of the citizen. It is not within the competency of government to invade the privacy of a citizen's life and to regulate his conduct in matters in which he alone is concerned, or to prohibit him any liberty the exercise of which will not directly injure society.

The difference between the absolute and relative rights of man, and the power of the government with reference thereto, is thus set forth by Blackstone in his Commentaries on the Laws of England: "The rights of persons considered in their natural capacities are also of two sorts, absolute and relative: Absolute, which are such as appertain and belong to particular men, merely as individuals or single persons; relative, which are incident to them as members of society, and standing in various relations to each other. The first—that is, absolute rights—will be the subject of the present chapter. By the absolute rights of individuals, we mean those which are so in their primary and strictest sense; such as would belong to their persons merely in a state of nature, and which every man is entitled to enjoy, whether out of society or in it. But with regard to the absolute duties which man is bound to perform, considered as a mere individual, it is not to be expected that any human mu-

nicipal law should at all explain or enforce them. For the end and intent of such laws being only to regulate the behavior of mankind, as they are members of society, and stand in various relations to each other, they have consequently no concern with any other but social or relative duties.   Let a man therefore be ever so abandoned in his principles, or vicious in his practice, provided he keeps his wickedness to himself, and does not offend against the rules of public decency, he is out of the reach of human laws.   But if he makes his vices public, though they be such as seem principally to affect himself (as drunkenness, or the like), they then become, by the bad example they set, of pernicious effects to society; and therefore it is then the business of human laws to correct them. Here the circumstances of publication is what alters the nature of the case.   Public sobriety is a relative duty, and therefore enjoined by our laws; private sobriety is an absolute duty, which, whether it be performed or not, human tribunals can never know; and therefore they can never enforce it by any civil sanction.'' Book 1, pp. 123, 124.

Cooley, in his work on Constitutional Limitations, thus states the rule with reference to sumptuary laws, and the right of the Legislature to enact them: ''In former times sumptuary laws were sometimes passed, and they were even deemed essential in republics to restrain the luxury so fatal to that species of government.   But the ideas which suggested such laws are now exploded utterly, and no one would seriously attempt to justify them in the present age.   The right of every man to do what he will with his own, not interfering with the reciprocal rights of others, is accepted among the fundamentals of our laws.'' Pages 549, 550.

John Stuart Mill, in his great work on Liberty, says: ''The object of this essay is to assert one very simple principle, as entitled to govern absolutely the dealings of society with the individual in the way of

compulsion and control, whether the means used be physical force in the form of legal penalties, or the moral coercion of public opinion. That principle is that the sole end for which mankind are warranted, individually or collectively, in interfering with the liberty of action of any of their numbers is self-protection. That the only purpose for which power can be rightfully exercised over any member of a civilized community, against his will, is to prevent harm to others. His own good, either physical or moral, is not a sufficient warrant. He cannot rightfully be compelled to do or forbear because it will be better for him to do so, because it will make him happier, because, in the opinions of others, to do so would be wise or even right. These are good reasons for remonstrating with him, or reasoning with him, or persuading him, or entreating him, but not for compelling him, or visiting him with any evil, in case he do otherwise. To justify that, the conduct from which it is desired to deter him must be calculated to produce evil to some one else. The only part of the conduct of any one, for which he is amenable to society, is that which concerns others. In the part which merely concerns himself, his independence is, of right, absolute. Over himself, over his own body and mind, the individual is sovereign." Pages 22, 23. And again: "secondly, the principle requires liberty of tastes and pursuits; of framing the plan of our life to suit our own character; of doing as we like, subject to such consequences as may follow; without impediment from our fellow creatures, so long as what we do does not harm them, even though they should think our conduct foolish, perverse, or wrong." Page 28.

In discussing the limits of the authority of society over the individual, our author says: "Though society is not founded on a contract, and though no good purpose is answered by inventing a contract in order to deduce social obligations from it, every one who receives the protection of society owes a return for

Commonwealth v. Campbell.

the benefit, and the fact of living in society renders
it indispensable that each should be bound to observe
a certain line of conduct towards the rest.   This con-
duct consists: First, in not injuring the interests of
one another, or rather certain interests, which, either
by express legal provision or by tacit understanding,
ought to be considered as rights; and, secondly, in
each person's bearing his share (to be fixed on some
equitable principle) of the labors and sacrifices in-
curred for defending the society or its members from
injury and molestation.   These conditions society is
justified in enforcing, at all costs to those who endeav-
or to withhold fulfillment.   Nor is this all that so-
ciety may do.   The acts of an individual may be hurt-
ful to others, or wanting in due consideration for
their welfare, without going the length of violating
any of their constituted rights.    The offender may
then be justly punished by opinion, though not by law.
As soon as any part of a person's conduct affects pre-
judicially the interests of others, society has jurisdic-
tion over it, and the question whether the general wel-
fare will or will not be promoted by interfering with it
becomes open to discussion.  But there is no room for
entertaining any such question when a person's con-
duct affects the interests of no persons besides him-
self, or needs not affect them unless they like (all the
persons concerned being of full age, and the ordinary
amount of understanding).   In all such cases there
should be perfect freedom, legal and social, to do the
action and stand the consequences." Pages 144, 145
and 146.  Again: "In like manner, when a person dis-
ables himself, by conduct purely self-regarding, from
the performance of some definite duty incumbent on
him to the public, he is guilty of a social offense.   No
person ought to be punished simply for being drunk,
but a soldier or a policeman should be punished for
being drunk on duty.   Whenever, in short, there is a
definite damage, or a definite risk of damage. either
to an individual or to the public, the case is taken out
of the province of liberty, and placed in that of moral-
ity or law."   Pages 157, 158.

Black, in his work on Intoxicating Liquors (page 50, § 38), says: "But it is justly held that a provision in such a law that no person, without a state license, shall 'keep' in his possession, for another, spirituous liquors,' is unconstitutional and void. 'The keeping of liquors in his possession by a person, whether for himself or for another, unless he does so for the illegal sale of it, or for some other improper purpose, can by no possibility injure or affect the health, morals, or safety of the public, and therefore the statute prohibiting such keeping in posession is not a legitimate exertion of the police power. It is an abridgment of the privileges and immunities of the citizen without any legal justification, and therefore void.''

In the case of State v. Gilman, 33 W. Va. 146, 10 S. E. 283, 6 L. R. A. 847, the Supreme Court of West Virginia held that a statute prohibiting the citizen to keep in his possession, for another, spirituous liquors, is unconstitutional and void. It is from the opinion in this case that Black adopted the quotation given above. The principle is rested upon the broad proposition that every person has a right to keep or use liquor for his own benefit, or to keep it for another, provided in so doing he does not attempt to sell it or otherwise use it so as to injure the public.

In the case of State v. Williams, 146 N. C. 618, 61 S. E. 61, 17 L. R. A. (N. S.) 299, it was held by the Supreme Court of North Carolina that a statute forbidding one under penalty to carry into a county, where the sale of intoxicating liquors is prohibited, more than a half gallon of such liquor on any one day deprives him of his constitutional property right in case he has no intent to sell it. In the opinion in this case the question before us is most learnedly discussed in all of its phases, and the principle which we have announced is upheld after a review of all the authorities.

In discusing the question before us, we have assumed that the general council of the city of Nicholas-

Commonwealth v. Campbell.

ville has been clothed with all the authority to enforce what is called the police power which the General Assembly possesses, and also that the city of Nicholasville has by regular proceedings prohibited the sale of liquor within its boundary; but with these assumptions we have not been able to uphold the warrant in this case. It will be observed that the defendant is not charged with having the liquor in his possession for the purpose of selling it, or even giving it to another. The sole charge against him is that he had it in his possession, and therefore we must presume that he had it there for a lawful purpose if he could so hold it. Nothing that we have said herein is in derogation of the power or the state under the Constititution to regulate the sale of liquor, or any other use of it which in itself is inimical to the public health, morals, or safety; but as spirituous liquor is a legitimate subject of property, its ownership and possession cannot be denied when that ownership and possession is not in itself injurious to the public. The right to use liquor for one's own comfort, if the use is without direct injury to the public, is one of the citizen's natural and inalienable rights, guaranteed to him by the Constitution, and cannot be abridged as long as the absolute power of a majority is limited by our present Constitution. The theory of our government is to allow the largest liberty to the individual commensurate with the public safety, or as it has been otherwise expressed, that government is best which governs the least. Under our institutions there is no room for that inquisitorial and protective spirit which seeks to regulate the conduct of men in matters in themselves indifferent and to make them conform to a standard not of their own choosing, but the choosing of the lawgiver; that inquisitorial and protective spirit which seeks to prescribe what a man shall eat and wear, or drink or think, thus crushing out individuality and insuring Chinese inertia by the enforcement of the use of the Chinese shoe in the matter of

the private conduct of mankind. We hold that the police power—vague and wide and undefined as it is —has limits, and in matters such as that we have in hand its utmost frontier is marked by the maxim: "Sic utere tuo ut alienum non ledas."

The judgment of the circuit court, quashing the warrant in this case, is affirmed.