**KEN–TEX EXPLORATION CO., Inc., et al.**
**v. CONNER et al.**

Court of Appeals of Kentucky.

May 9, 1952.

Rehearing Denied Oct. 17, 1952.

S. V. Brents, James A. Hicks, Albany, for appellants.

Russell Jones, Somerset, J. A. Flowers, Hile Pritchard, Albany, for appellees.

SIMS, Justice.

This action involves the title to about 69 acres of unfenced oil lands in Clinton County on Willis Creek, and damages for crude oil taken from certain wells. It was stipulated the chancellor would first dispose of the question of title and later would determine the damages for the oil taken.

All persons asserting title to the land in dispute, as well as those holding oil and gas leases thereon, were made parties or else intervened in the action. In a lengthy opinion the chancellor quieted the title to the land in the plaintiffs.

Plaintiffs claim title through a patent for 340 acres issued in 1849 to their grandfather, C. M. Conner, while defendants trace their title to a patent for 265 acres issued J. C. York in 1868. The York patent overlaps the northern part of the Conner patent and it is evident that if defendants are to succeed, they must establish title by adverse possession to the overlap.

In partitioning the land of C. M. Conner in 1876, the Russell County Court directed commissioners to divide the 340 acre patent by allotting 86⅔ acres to a daughter, Elizabeth McWhorter, and by allotting 126⅔ acres each to the sons, F. M. Conner and L. M. Conner. This the commissioners did as is shown by a copy of the proceedings in the Russell County Court filed as an exhibit in this action. The tracts allotted to the two boys were described by calls and distances, but the description in the tract allotted to Elizabeth reads: "Also 86⅔ A. off the N.E. end of a 340 acre survey in Clinton County on the waters of Willis Creek". There is evidence that Elizabeth got a deed to this land but it was never recorded and it burned when her house was destroyed by fire. She and her husband conveyed this land to F. M. Conner, father of plaintiffs, on August 30, 1880, and that deed gave the same description as just above quoted.

Plaintiffs have never occupied this 86⅔ acres and admittedly have lost some 15 acres thereof to adverse holders other than defendants, and plaintiffs are now asserting title to the remaining 69 acres through the deed Elizabeth executed to their father. Defendants vigorously insist the above-quoted description in Elizabeth's deed is so uncertain and indefinite as to make the conveyance void, thereby causing plaintiffs' record title to fail. Plaintiffs proved they located this land by starting at a well-known corner in the eastern line of the Conner patent and following same to the northeast corner of the patent and then running west with the northern line of the patent a sufficient distance to cut off 86⅔ acres in the shape of a parallelogram.

Courts are liberal in construing descriptions in deeds with a view of determining whether a description is sufficiently definite and certain to identify the land and make the instrument operate as a conveyance. They apply the maxim, "That is certain which can be made certain", and if a surveyor with the deed before him can with the aid of extrinsic evidence locate the land and establish its boundaries, the description is held to be sufficient. 16 Am.Jur. "Deeds", § 262, p. 585; Casteel v. Pennington, 228 Ky. 206, 14 S.W.2d 753; Culton v. Napier, 272 Ky. 384, 114 S.W.2d 480. A number of witnesses testified this tract had been surveyed years ago and the lines and corners, with the possible exception of the southwest corner, were marked and the land was and could be easily identified. The chancellor did not err in holding the description in the Elizabeth McWhorter deed to be sufficiently definite.

While the chancellor correctly held the description in this Elizabeth McWhorter deed was sufficiently definite, he failed to apply this same principle of law to the deeds by which Johnny Ferrell and T. J. Cooksey acquired lands upon which defendants hold oil leases. The descriptions in each of these deeds call for lines such as "beginning at a white oak, thence to a beech". The proof shows the lines in these two deeds had been surveyed and marked and located on the ground. Thus the chancellor erred in holding the descriptions of the Johnny Ferrell and of the T. J. Cooksey tracts were so indefinite as to invalidate these two deeds.

J. C. York died intestate and in 1910, soon after his death, his heirs conveyed his lands to Aaron Tallent, who on November 4, 1915, conveyed same to J. P. Davis. Some question is raised as to whether these conveyances included the J. C. York patent of 265 acres, but when C. C. Coffey surveyed and mapped these lands

from Tallent's deed, they ran out 354 acres and included within their boundary the 86 acre tract which is in controversy. All the parties admit the York patent overlaps the northern part of the Conner patent and that the 86 acre tract was included in the overlap, so we need not discuss the amount of land conveyed to Tallent by the York heirs, or how much Tallent conveyed Davis. Our question is whether or not J. C. York occupied the overlap for fifteen years, claiming to the extent of the boundary marked in his 265 acre patent, which was a well-marked and defined boundary.

The solution of this question depends upon whether the proof shows J. C. York occupied a two-room log house or cabin in "Lige Hollow", which house is not now standing and its purported site is now in cleared land with an oil well within some 25 or 50 feet of where the old house is said to have stood.

C. C. Coffey in making his survey of the York patent and of the lands the heirs sold Tallent, saw the old house site near the oil well and identified it by some old fruit trees standing nearby. James A. Aaron, Sr., 62 years of age, testified J. C. York had a house in "Lige Hollow" and his father bought timber off this land from York; that there is now an oil well within 50 feet of the site of the old house and "There has been a growth of peach trees ever since the house has been there, I noticed a few of them still there, a very small hollow in there, practically level". The witness noticed a few of these peach trees there, "last week". Witness was reared on the land adjoining the York tract and often stayed all night in the York house with Amos Marcum, who lived there with his stepfather Riddle, as he and the Marcum lad hunted together. The witness named other persons he remembered living in this cabin; Bud Elmore, who was J. C. York's son-in-law; and Josh Witham.

Joe Ferrell, 69 years of age, who has lived in this section all of his life and who is familiar with the York lands, testified his father cut timber on the shares on the

land in dispute; that one time he heard J. C. York say he lived in this cabin, which stood in "Lige Hollow" near where the oil well now is. The record does not show any objection to witness testfying as to what York told him. The cabin was occupied by York's tenants from 1891 to York's death in 1910. Witness named as its occupants, Jane York, a sister of J. C. York; Lige Ferguson, with whose boy witness at times spent the night; Bud Elmore, son-in-law of J. C. York; Josh Witham; and Amos Marcum. Jane York had two sons and one of them married the witness' sister while Jane lived in this cabin.

Johnny Ferrell, 50 years of age; J. W. Myers, 78 years of age; Herschel Brown, 65 years of age; Rev. R. A. Witham, 78 years of age, and Clay Witham, 68 years of age, all corroborate James A. Aaron and Joe Ferrell as to this cabin being located in "Lige Hollow" and occupied by J. C. York through the persons those two witnesses named. Myers testified he was at this cabin the day Jane's eldest boy, Bill, married; and Brown testified he was born in this cabin while J. C. York used it as a tenant house. Rev. Witham remembers when Jane York lived in the J. C. York cabin and her boy married the Ferrell girl. He thinks he wrote the deed from the York heirs to Tallent and the deed from Tallent to J. P. Davis.

These witnesses for defendants were contradicted by plaintiffs' witnesses, Ryan Dicken, 72 years of age; Alvis Brown, 83 years of age; and Nannie Bell York, who did not know her age but was over 75, and is the widow of Richard York. These three witnesses testified that Jane York never lived in "Lige Hollow" but lived in the Richard York house. Brown testified his brother, Billy, built a house in a hollow 200 or 300 yards from the Conner land; that there was never a house on the Conner land, which was all in woods. But it is admitted that some 15 or 20 acres of the overlap had been cleared and there were a couple of houses on it. Mr. Brown destroyed his testimony for accuracy when he said the Conner and York patents do not overlap, since that is admitted by all par-

ties, as well as the witnesses who are familiar with the lands. Dicken testified his grandfather, Ellison Brown, built a house in "Lige Hollow", but he could not say whether he was a tenant of J. C. York; that the Billy Brown house was on a hill and not in a hollow as Alvis Brown had placed it. Dicken mentioned a couple of other houses "at the mouth of the hollow below a calmus patch". When asked if the various people whom defendants' witnesses named lived in the J. C. York house, Dicken replied, "Not that I know of". He did not know that the York patent overlapped the Conner patent. Also, he denied the York heirs sold to Aaron Tallent.

Nannie Bell York did not know her age or how long she had ben married, although she testified she married when she was 13 years of age and "I've seen a heap of trouble too." To a leading question she said she was more than 75 years of age. Jane was the mother of Richard York and Nannie said Jane lived on the Richard York place, but that she did not know where Jane lived before moving on Richard's place.

■■ While we give weight to the finding of the chancellor, we will examine the evidence in an equity action and reverse the judgment when convinced the chancellor has erred. Cassinelli v. Stacy, 238 Ky. 827, 38 S.W.2d 980; Deep v. Farmers Nat. Bank, 247 Ky. 801, 57 S.W.2d 1002; Hodges v. Daviess County, 285 Ky. 508, 148 S.W.2d 697. The resumé we have given of the evidence clearly shows that the chancellor's judgment is erroneous. While the number of witnesses is not always important, the clearness and definiteness with which they testify is important. The eight witnesses for defendants who testified that the location of the York tenant house was within the overlap gave clear and convincing testimony. Two of them saw peach trees where the old house stood. Two others had been there to weddings of Jane York's sons, and a sister of one witness married one of Jane's sons while she lived in the cabin. One of the witnesses was born in the house. Two of them often stayed all night there and hunted with the occupants of the cabin, and practically all of these witnesses named the same persons as being the various occupants of the cabin.

Against this clear and convincing evidence there is the testimony of Nannie Bell York who does not know her age or how long she has been married. While she stated that Jane lived on the Richard York place, she admits she did not know where Jane lived before going to Richard's home. Alvis Brown was very old and testified there was no overlap of the Conner and York patents. He further testified the Conner land was all in woods and there was never any house on it, when it is admitted that some 15 or 20 acres have been cleared and there were a couple of houses in the overlap. Ryan Dicken's testimony was not as clear and direct as that given by the many witnesses who testified as to the adverse possession of York to this overlap. Dicken was unable to say that his grandfather was not a tenant of York. Nor could Dicken say that the people named as the occupants of the York cabin did not live in it. All he could state on the question was that if they did occupy this cabin, "it was unknownst to me".

■ This record convinces us that J. C. York occupied through tenants this cabin in the overlap from 1891 until his death in 1910, which gave him title to the overlap by adverse possession to the well-marked and defined boundaries of his patent. York having acquired title by adverse possession to the land in dispute, his heirs conveyed it in 1910 to Aaron Tallent and by mesne conveyances the title passed to defendants.

Since we have reached the conclusion that defendants have title to the land in dispute by reason of the adverse possession by their predecessor in title, J. C. York, it is not necessary for us to consider the question of estoppel raised by defendants against plaintiffs relative to the oil wells.

The judgment is reversed and one will be entered in conformity with this opinion quieting defendants' title to the land in dispute and to the oil and gas leases thereon.

CAMMACK, C. J., not sitting.

LATIMER, J., dissenting.