COMMONWEALTH of Kentucky,
Appellant,

v.

Woody HARRELSON, Appellee.

No. 1998–SC–1048–DG.

Supreme Court of Kentucky.

March 23, 2000.

A.B. Chandler III, Attorney General of Kentucky, Frankfort, Thomas P. Jones, Special Assistant Attorney General, Beattyville, for appellant.

R. Burl McCoy, Charles E. Beal II, Tonya S. Conner, McCoy & West, Lexington, for appellee.

WINTERSHEIMER, Justice.

This appeal is from a decision of the Court of Appeals vacating the judgment of the Lee Circuit Court which affirmed a ruling by the Lee District Court finding that the definition of marijuana in KRS 218A.010(12) is unconstitutionally overbroad. The Court of Appeals remanded the case to the circuit court with directions to dismiss the appeal on the ground that it was taken from a nonfinal order.

The major issue is whether the decision of the Lee District Court which held that KRS 218A.010(12) was unconstitutional is correct. Other questions presented are whether the circuit court erred in affirming the judgment of the Lee District Court; whether the circuit court erred in affirming a finding that a viable economic benefit could be derived from the nonhallucinogenic parts of the marijuana; whether

the entire matter should be dismissed for territorial procedural defects and whether the appeal was taken from a nonfinal order of the district court.

The facts of this matter are not in dispute. On June 1, 1996, Woodrow Harrelson planted four hemp seeds on a tract of land in rural Lee County. He was cited and arrested for a violation of KRS 218A.1423(3), cultivation of marijuana, five or fewer plants, a Class A misdemeanor. The charge was later amended to possession of marijuana, KRS 218A.1422, also a Class A misdemeanor. He pled not guilty and moved to dismiss the charge contending that the hemp seeds did not come within a proper statutory definition of marijuana, or, if they did, that the statute was unconstitutionally overbroad and vague.

Harrelson specifically challenged the constitutionality of the 1992 amendment to KRS 218A.010(12), now subsection (14). After a hearing on the question of constitutionality, the district judge rejected the argument by Harrelson that the statute was void for vagueness but agreed that the statute is unconstitutionally overbroad by including the nonhallucinogenic parts of marijuana. The district court concluded that the statute violated Section Two of the Kentucky Constitution as an arbitrary exercise of state authority. He also found that an issue of fact remained concerning whether the seeds planted by Harrelson were capable of germination or producing plants that contain the hallucinogenic properties of marijuana. The matter was set for trial on that question. The Commonwealth filed an interlocutory appeal from the ruling of the district judge; the circuit court affirmed, and the Court of Appeals dismissed the appeal reasoning that it was taken from a nonfinal order. This Court granted discretionary review.

By agreement of the parties, a hearing on the motion to dismiss was held in Owsley County where both the Commonwealth and the defendant presented three witnesses each. The first witness for the Commonwealth was Sgt. James Tipton, a 24 year member of the Kentucky State Police who currently works for Special Operations as a Special Project Coordinator and member of the Governor's Marijuana Strike Force. It was not challenged that Sgt. Tipton had been involved in approximately one thousand drug investigations and that he had investigated all types of drug crimes, including marijuana. The witness held an undergraduate degree in police administration and was a graduate of the F.B.I. National Academy and the Southern Police Institute. He taught at the National Interagency Drug Institute in California as well as classes on drugs and crime at Eastern Kentucky University. He testified in hundreds of cases and had been permitted to give an expert opinion in both federal and state courts on marijuana and cocaine. He testified that his experience with countries in which hemp was legalized indicated that they were already having difficulties in the prosecution of marijuana cases because violators use hemp as a defense arguing that they thought they were growing lower-grade marijuana. He concluded that decriminalization of hemp would make it easy for the violators and difficult for law enforcement.

Next, the Commonwealth called an extension professor for the University of Kentucky who had been employed for 25 years, who had a B.S., M.S. and Ph.D. from Purdue University in plant breeding and genetics. He testified about a plant called kenaf, which is free of THC and which can be used for anything that wood is used for, including making paper. The witness testified that kenaf produced higher quality products than hemp because of its shorter fiber.

Finally, the prosecution called a professor and chairman of the Department of Agronomy at the University of Kentucky. This witness had received a bachelor and masters degree in biology and soil science from Cornell University and a Ph.D. in soil microbiology from Michigan State University. He had also authored a large portion

of the report of the Governor's Task Force on Hemp and Alternative Fiber Products. His testimony indicated that the opportunities for hemp as a crop in Kentucky were limited. He stated that at one time hemp was a major cash crop in central Kentucky but that its uses went by the wayside so it failed economically for market reasons.

The defendant, a television and motion picture actor, testified that he owned a company in California that produced textile products in clothing derived from hemp. He testified that the seeds planted were "French seeds" and that these were less than one percent THC. He stated that his company had sales of $1.5 million in the United States but that the hemp for their products had to be imported from Hungary and China and that the price of hemp would be lower if it could be grown domestically.

On cross-examination, Harrelson admitted that he knew he was breaking the law when he planted the seeds but that he was concerned about the cutting and replacement of trees as well as the sale of hemp. Harrelson, who presented no academic credentials, acknowledged that he had no experience in law enforcement and that the police sergeant would be better qualified to determine if law enforcement would be impeded from enforcing marijuana laws if hemp were legalized.

Another defense witness was a professor of biology who testified about the economic uses of hemp at the present time and the differences in appearance of hemp and marijuana to the naked eye. He stated that if legalized, it would greatly reduce the cutting of trees and be a tremendous asset to the agricultural base of Kentucky. He admitted on cross-examination that he did not have any training in agricultural economics. The defense also presented a professor of pharmacology and toxicology at the University of Louisville who testified that hemp was less potent than marijuana in its THC level.

Upon the conclusion of the hearing and the filing of briefs by both parties, the trial judge determined that the statute was constitutionally defective because of its overbroad application by including nonhallucinogenic plant parts. The trial judge further determined that the amendment to KRS 218A.010(9) had no rational basis for including the nonhallucinogenic parts of the marijuana plants in the definition. The trial judge determined that the statute violated Section Two of the Kentucky Constitution and that the defendant had established a viable economic benefit of nonhallucinogenic parts of marijuana. He further held that the statute was an intrusion into the economic benefit of the product without a rational basis by the government. The Court severed the statute in question as it related to the issue of including nonhallucinogenic plant parts of marijuana as a controlled substance.

## I. Appealable Order

The Court of Appeals erred in determining that the appeal to the circuit court was taken from a nonfinal order. CR 54.01 states in part that a "final or appealable judgment is a final order adjudicating all the rights of all the parties in an action or proceeding ..." As noted in *Commonwealth v. Taylor*, Ky., 945 S.W.2d 420 (1997): "The fundamental rule is that for an order to be final and appealable, it must adjudicate all claims of the parties at the time the order was entered." Here, the principal question is a challenge to the constitutionality of the statute. The issue was fully adjudicated and subject to appeal.

The factual issue which the district court reserved on was spurious. The district court had no authority to add words to the statute and thereby create a question of fact as to whether the marijuana possessed "was capable of germination or producing plants which contained hallucinogenic properties of marijuana."

In this case, the district court impermissibly added new wording to the offense of the possession of marijuana be-

cause it indicated that it must now be proven that not only did the defendant possess marijuana but that he possessed marijuana which was capable of germination or producing plants which contained hallucinogenic properties of marijuana. Existing Kentucky law does not require that a sample of marijuana be produced at trial. *Howard v. Commonwealth,* Ky. App., 787 S.W.2d 264 (1990). Consequently, by remanding this question for trial, the defendant would be required to be tried under a statute which had been declared unconstitutional in part and to be tried under a statute with additional language supplied by the district court and not by the General Assembly. The judiciary lacks the authority to add new phrases to a statute to provide a new meaning necessary to render the statute constitutional. *Musselman v. Commonwealth,* Ky., 705 S.W.2d 476 (1986). The same is true when the judiciary attempts to declare a statute unconstitutional. Where a statute is intelligible on its face, the courts are not at liberty to supply words or insert something or make additions which amount, as sometimes stated, to providing for a *casus omissus,* or cure an omission. *Cf. Taylor* at 423.

■ In cases involving statutory interpretations, the duty of the court is to ascertain and give effect to the intent of the General Assembly. We are not at liberty to add or subtract from the legislative enactment or discover meanings not reasonably ascertainable from the language used. *Cf. Commonwealth v. Frodge,* Ky., 962 S.W.2d 864 (1998).

The fact that the district court reserved certain questions of law as to whether any part of the seeds planted by Harrelson contained THC was never raised by the parties and the action by the district court of severing the statute in this manner was beyond its authority. *Estes v. Commonwealth,* Ky., 952 S.W.2d 701 (1997), held that the statute must be tested "on the basis of what is said rather than what might have been said."

Therefore the district court improperly added language to a statute which it found unconstitutional. The district court did not have such authority and its order in this regard was subject to appeal. The question here is a challenge to the constitutionality of the statute. The rights of the parties were fully adjudicated and thus subject to appeal.

## II. Circuit Court Error

■ The circuit court erred in affirming the decision of the district court which held that KRS 218A.010(12) was unconstitutional in part because the presumption of constitutionality which applies to every statute was ignored by the trial court and the circuit court. Harrelson did not overcome this presumption.

Originally, Harrelson challenged the constitutionality of the statute for vagueness and overbreadth. At the Court of Appeals, based on the facts developed in this case, Harrelson conceded that the statute is not vague as applied to him. He continues to argue that the statute is too broad and that it is so arbitrary as to be unconstitutional in violation of Section Two of the Kentucky Constitution.

In 1992, the General Assembly amended KRS 218A.010(12) so as to eliminate the following language from the definition of marijuana:

It does not include mature stalks of the plant, fiber produced from the stalks, oil or cake made from the seeds of the plant, any other compound, manufacture, salt, derivative, mixture or preparation of the mature stalks (except the resin extracted therefrom), fiber, oil or cake, or the sterilized seed of the plant which is incapable of germination.

The remaining language of the statute provides a definition of marijuana in what is now (14), as follows:

"Marijuana" means all parts of the plant cannabis sp., whether growing or not; the seeds thereof; the resin extracted from any part of the plant; and every

compound, manufacture, salt, derivative, mixture, or preparation of the plant, its seeds or resin or any compound, mixture, or preparation which contains any quantity of these substances.

The legislature was well within its authority to designate and define *all parts* of the plant cannabis sp. as a controlled substance.

■ It is obvious that the legislative intent was to eliminate the previous exemptions. The literal language of the statute is both plain and unambiguous and must be given effect as written. The words used in the statute are to be given their ordinary meaning. *Cf. Lynch v. Commonwealth*, Ky., 902 S.W.2d 813 (1995), which cited *Griffin v. City of Bowling Green*, Ky., 458 S.W.2d 456 (1970).

The 1992 amendment is a specific response to a serious and growing concern of the public and the legislature regarding illegal drug activities in Kentucky. The section was amended to assist law enforcement authorities in the investigation and prosecution of illegal drugs at all levels. It cannot be seriously contended that the elimination of illegal drug trade is not a beneficial or worthwhile goal of the law.

Harrelson complains that the action of the General Assembly in amending the statute does not have a reasonable basis.

■ It is uncontroverted that a statute is presumed to be constitutional unless it clearly offends the limitations and prohibitions of the Constitution. "The one who questions the validity of an act bears the burden to sustain such a contention." *Stephens v. State Farm Mutual Auto Ins. Co.*, Ky., 894 S.W.2d 624 (1995).

■ The valid public interest in controlling marijuana is a public issue involving health, safety and criminal activity. *Kentucky Milk Marketing & Anti-monopoly Comn. v. Kroger Co.*, Ky., 691 S.W.2d 893 (1985) and *Commonwealth v. Foley*, Ky., 798 S.W.2d 947 (1990), state as follows:

Whatever is contrary to democratic ideals, customs, and maxims is arbitrary. Likewise, whatever is essentially unjust and unequal or exceeds the reasonable and legitimate interests of the people is arbitrary. No board or officer vested with governmental authority may exercise it arbitrarily. If the action taken rests upon reasons so unsubstantial, or the consequences are so unjust as to work a hardship, judicial power may be interposed to protect the rights of persons adversely affected.

It cannot reasonably be argued that the inclusion of nonhallucinogenic plant parts in the definition of marijuana is in any way "essentially unjust and unequal," nor does it "exceed the reasonable and legitimate interests of the people."

■ Here, there is sufficient testimony from law enforcement that there would be serious difficulties for law enforcement in controlling marijuana trafficking if hemp were legalized. There is no evidence of any kind in the record that the commercial business interest of Harrelson has been compromised simply by the necessity of having to import hemp from other countries. Harrelson admitted under oath that he was not qualified to contradict the testimony of the police expert. This statute does not "clearly offend" the limitations and prohibitions of the Constitution as outlined in *Stephens, supra.*

■ Reliance by Harrelson on his reference to great moral issues of the current times is unpersuasive. The alleged moral concerns expressed in *Commonwealth v. Wasson*, Ky., 842 S.W.2d 487 (1992) and *Commonwealth v. Campbell*, 133 Ky. 50, 117 S.W. 383 (1909), are not evident here in view of the fact that the statute applies to the health, safety and well-being of the citizens of Kentucky without reference to so-called "moral" issues.

We note with interest that the United States Court of Appeals for the First Circuit in *New Hampshire Hemp Council, Inc. v. Marshall*, 203 F.3d 1, (1st Cir.

N.H.), decided on January 28, 2000, that industrial hemp plants were marijuana as defined by the federal drug statute. The principal argument in that case was that the plants produced for industrial products contain very little THC. The federal appeals court concluded that the literal language of the federal law and enforcement concerns supported the application of the federal statute.

### III. Clearly Erroneous

■■■ The circuit court erred in affirming the judgment of the district court because the district court made a clearly erroneous finding that the Commonwealth had failed to show a rational basis by the government for including hemp in the definition of marijuana.

Initially, we must observe that the ruling here was in connection with a motion to dismiss and not a bench or jury trial. The defense called no witnesses who could be considered to be law enforcement officials. The prosecution's police witness testified about the problems that hemp would create for law enforcement. Defense witnesses Harrelson and Dr. Pierce both admitted that the police officer would be better qualified to determine if law enforcement would be impeded in enforcing marijuana laws if hemp were legalized. The other defense witness never answered as to who would be better qualified but did admit that he was involved in only a couple of criminal investigations. Notwithstanding the testimony of the police official, the district court found and the circuit court affirmed that no rational basis had been shown for the legislature to include hemp in the definition of marijuana. We disagree.

■■■ The test of the constitutionality of any statute is whether it is unreasonable or arbitrary. *Moore v. Ward*, Ky., 377 S.W.2d 881 (1964). A statute is constitutional if a reasonable and legitimate public purpose for it exists. The rational basis argument can be paraphrased as "Is there a good reason to adopt a law?" The answer is a stunningly simple "Yes." The legislature has broad discretion to determine what is harmful to the public health and welfare. *See Walters v. Bindner*, Ky., 435 S.W.2d 464 (1968). As noted in *Buford v. Commonwealth*, Ky.App., 942 S.W.2d 909 (1997) a succinct analysis of the problems with the illegal drug culture can be found in *People v. Shephard*, 169 Cal.App.2d 283, 337 P.2d 214 (1959), which stated:

> Anything which gives sustenance, solace, comfort or encouragement in the selling of narcotics or in the agreeing to sell narcotics, can be condemned and properly so, by the legislature. It is clear that the statute in question was aimed at discouraging any traffic in narcotics and is therefore within the police power of the state.

■■■ One of the major reasons for CR 52.01 is to have the record show the basis of the decision of the trial court so that on appellate review, the appellate court may understand more completely the entire controversy. *Reichle v. Reichle*, Ky., 719 S.W.2d 442 (1986). The reviewing court may test the accuracy of the findings and conclusions and determine whether they are sufficiently comprehensive and pertinent to the issues so as to provide a basis for a decision. The clearly erroneous standard is sufficiently broad to permit a reviewing court to adopt a method of review which best fits the questions involved and the particular facts in a specific case. The appellate court should review each case according to what is most appropriate under the specific circumstances.

■■■ Although due deference is given to the findings of the trial court, the evidence may be examined and the judgment may be reversed when the reviewing court is convinced that the trial judge has committed error. *Ken–Tex Exploration Co. v. Conner*, Ky., 251 S.W.2d 280 (1952). Mere doubt as to the correctness of a finding would not justify reversal, and the appellate court does not consider and

weigh evidence de novo. However, if a finding is without adequate evidentiary support or occasioned by an erroneous application of the law, the reviewing court may regard it as clearly erroneous. *Cf. Byerly Motors, Inc. v. Phillips Petroleum,* Ky., 346 S.W.2d 762, 765 (1961).

■ A reviewing court is always reluctant to disturb the findings of a trial court. *See Allen v. Arnett,* Ky., 525 S.W.2d 748 (1975). When the trial court makes findings of fact, a reviewing court will not disturb such findings unless clearly erroneous. However, if the trial court predicates its findings on erroneous construction and application of statutes, the clearly erroneous standard does not apply. *Commonwealth v. Kentucky Products, Inc.,* Ky., 616 S.W.2d 496 (1981).

Consequently, upon our review of the testimonial evidence presented in this case, we must conclude that the district court was clearly erroneous when it determined that there was no rational basis for the action of the General Assembly in including hemp in the definition of marijuana.

An examination of the testimony of the police officer and the defense witnesses does not amount to the resolution of a conflict. This is not a case where there was sufficiently credible evidence on both sides of the issue. The findings of the district court were not supported by substantial evidence.

## IV. Economic Benefit

■ The circuit court erred in affirming the clearly erroneous finding of the district court that a viable economic benefit could be derived from the nonhallucinogenic plant parts of marijuana, otherwise known as hemp. A careful examination of the record indicates that there was sufficient evidence that all hemp has some THC in it. The district court ruled that Harrelson had established a viable economic benefit from the nonhallucinogenic plant parts of hemp and yet the ruling does not allow the planting of hemp be-cause the testimony of Harrelson's witnesses stated that all hemp has some form of THC. We must conclude that the decision by the district court that Harrelson has shown that a viable economic benefit exists with hemp was clearly erroneous because there was no evidence that hemp would ever be a successful domestic crop. In any event the economic benefits to be realized from hemp are not relevant to the constitutionality of the statute in question as admitted by Harrelson in his brief.

## V. Jurisdiction

■ The territorial jurisdictional argument raised is without merit. This case can be factually distinguished from *Wolfenbarger v. Commonwealth,* Ky.App., 936 S.W.2d 770 (1997). Here, the Lee District Judge who presided over the motion was, unlike the judge in *Wolfenbarger, supra,* within his own district because he presides over Lee, Owsley and Estill Counties. The same situation applies to the oral argument heard in Estill County by the circuit judge because he is circuit judge for Estill County as well as for Lee and Owsley. Thus, the district judge conducted the agreed upon proceedings on the motion within his own district and the circuit judge presided over the case in his own circuit.

■ The General Assembly has criminalized the possession of marijuana because it contains THC. Both marijuana and hemp are members of the cannabis sp. of plants and hemp also contains THC, although arguably substantially lesser amounts than marijuana. The legislature has properly classified THC as a Schedule I controlled substance, KRS 218A.050(3), and has defined marijuana broadly enough to include hemp within that definition. KRS 218A.010(14). The mere fact that hemp may contain less THC than marijuana is of no consequence. *Commonwealth v. Shivley,* Ky., 814 S.W.2d 572 (1991), holds that the quantity of the controlled substance possessed is immaterial to the criminality of the act and that "any

amount" suffices. The statutory system which criminalizes the possession of marijuana and includes hemp does not violate Section 2 of the Kentucky Constitution.

In this matter a review of the testimonial evidence presented by both sides convinces this Court that the decision of the district court was clearly erroneous and that there was no substantial evidence to support that ruling. The Commonwealth was able to demonstrate a rational basis for the inclusion of hemp with marijuana as a prohibited substance under the statute.

The arguments of the defendant regarding the legalization of hemp are matters more properly for the General Assembly and not the judicial branch of government.

The decisions of the Court of Appeals, the circuit court and the district court are reversed and this matter is remanded to the district court for trial or other appropriate action.

LAMBERT, C.J., GRAVES, JOHNSTONE and WINTERSHEIMER, JJ., concur.

COOPER, J., concurs by separate opinion in which STUMBO, J., joins.

KELLER, J., concurs by separate opinion.

COOPER, Justice, concurring.

I disagree with the proposition that the mere fact that hemp resembles marijuana provides a rational basis for criminalizing the possession of hemp. If that were true, the legislature could criminalize the possession of sugar because it resembles powder cocaine.

Nevertheless, the reason the General Assembly has criminalized the possession of marijuana is that it contains hallucinogenic substances known as Tetrahydrocannabinols (THC). Both marijuana and hemp are members of the Cannabis species of plants and hemp also contains THC, though admittedly to a substantially lesser extent than does marijuana. The legisla-

ture has classified THC as a schedule I controlled substance, KRS 218A.050(3), and has defined "marijuana" broadly enough to include hemp within that definition. KRS 218A.010(14). But even if hemp were not included within the definition of marijuana, possession of any substance containing THC would constitute possession of a controlled substance in the second degree, which carries a potentially greater penalty than possession of marijuana. *Compare* KRS 218A.1416 and KRS 218A.275 *with* KRS 218A.1422 and KRS 218A.276. We have held that the quantity of the controlled substance possessed is immaterial to the criminality of the act and that "any amount" suffices. *Commonwealth v. Shivley*, Ky., 814 S.W.2d 572 (1991). Thus, the fact that hemp contains less THC than marijuana is immaterial to the criminality of its possession.

Kentucky is not unique in criminalizing the possession of THC. The United States Congress also classifies THC as a schedule I controlled substance, 21 U.S.C. § 812(c), Schedule I(c)(17); *see also* 21 C.F.R. § 1308.11, Schedule I(d)(27), and provides criminal penalties for its possession. 21 U.S.C. § 841(a)(1) and (b)(1)(C).

Because there is a rational basis for criminalizing the possession of hallucinogenic substances such as Tetrahydrocannabinols (THC), and because hemp contains THC, I conclude that the statutory scheme which criminalizes the possession of hemp does not violate section 2 of our Constitution. For that reason, I concur in the result reached by the majority in this case.

STUMBO, J., joins this concurring opinion.

KELLER, Justice, concurring.

I agree with Justice Cooper's concurring opinion that the Legislature cannot criminalize the possession of hemp (cannabis sativa indica) consistently with Kentucky Constitution § 2 simply because it physi-

cally resembles marijuana (cannabis sativa sativa) and may complicate drug enforcement efforts. In my opinion, the General Assembly may prohibit or otherwise regulate hemp within its definition of marijuana, KRS 218A.010(14), because hemp contains a quantity of tetrahydrocannabinols (THC). We need not, however, rely upon other legislation enacted by the General Assembly or the United States Congress to support the conclusion that the regulation of any quantity of THC is properly within the General Assembly's police power. Almost a century ago, the predecessor to this Court examined the contours of Kentucky Constitution § 2 and the General Assembly's police power with respect to the regulation of intoxicating beverages, and concluded, with respect to "cider," "malt mead," and "near beer," that the presence of a potentially harmful substance (alcohol) and not the concentration of that substance determined whether it may be regulated.

In pre-prohibition Kentucky, the forces of temperance sought to regulate alcohol within the context of Kentucky's local option law, which allowed towns and localities to prohibit or otherwise regulate the sale of alcoholic beverages:

> The year 1891, under the new Kentucky Constitution, witnessed the passage of an elaborate and detailed local option law by the legislature to ascertain the wishes of the people locally concerning the sale of alcoholic beverages. In-

stead of 20 legal voters as required in the law of 1873, the number of legal voters who could call an election was made dependent on at least 25 per cent of the votes cast in each district at the last general election. A majority vote would decide the outcome of the election.

. . .

> The Kentucky Occupational license fees were closely related to local control purposes. At first the retailing stage only was taxed. The early single-tavern license evolved into a retail license fee graduated in amount according to whether the retailer also operated a tavern or was a merchant only. Both state and local license fees were authorized. The post-Civil War legislation continued the classification of retail licenses revolving around the distinction of whether food and merchandising activities were associated with the retailing of spirits. In the decade of the 1880's this classification was continued but was fused with another classification graduated directly according to the alcoholic proof of the beverage dispensed at retail.[1]

Pursuant to these local option statutes, various statutes and ordinances were passed regulating the retailing of alcoholic beverages through measures ranging from outright prohibitions[2] to limitations on the times when taverns may remain open[3] and the age and gender of those allowed on the premises.[4]

1. Obra F. Traylor, "Patterns of State Taxation of Distilled Spirits With Special Reference to Kentucky," 9 *Quarterly Journal of Studies on Alcohol*, pp. 585–592 (March, 1949).

2. *See, e.g., Powers v. Commonwealth*, Ky., 90 Ky. 167, 13 S.W. 450 (1890) (upholding the constitutionality of an act which made it unlawful for "any person or persons to sell, barter, give, loan, or traffic in spiritous, vinous, or malt liquors, in any quantity whatsoever, within the county of Rowan. . . ." *Id.*)

3. *See McNulty v. Toopf*, 116 Ky. 202, 75 S.W. 258 (1903) (upholding the constitutionality of an ordinance "prohibiting the selling, dispensing or giving away of any spiritous, vi-

nous or malt liquors, between the hours of 10:30 o'clock p.m. and 5 o'clock a.m." *Id.*); *Commonwealth v. McCann*, 123 Ky. 247, 94 S.W. 645 (1906) (upholding a statute providing: "Any person who shall, on Sunday, keep open a barroom or other place for the sale of spiritous, vinous, or malt liquors, or who shall sell or otherwise dispose of such liquors, or any of them, shall be find not less than $10.00 nor more than $50.00 for each offense." *Id.*)

4. *See Commonwealth v. Price*, 123 Ky. 163, 94 S.W. 32 (1906) (upholding an ordinance of the city of Madisonville which made it unlawful for any infant or female to go into or be in or drink intoxicating liquors in any saloon or place for sale of such liquors. . . ." or for any

In 1901, our predecessor Court considered a challenge to an ordinance passed by the City of Pikeville which regulated the sale of hard cider [5] with an occupational license tax.[6] The Court found the tax constitutional, as the power to regulate alcohol is not dependent on the degree of a beverage's intoxicating effect:

> To what extent government may regulate or prohibit useful, or even harmless, callings, as an invasion of the citizen's liberty in the "pursuit of happiness," is not here involved. It is generally conceded now, and certain in this state is it established, that it is a proper exercise of the police power, inherently incidental to government, to regulate by license or otherwise, or even to prohibit, those callings hurtful to the morals, the health, or the peace of society. Embraced in such is the making, vending, and use of intoxicants. *Those liquors coming within the accepted definitions of "spiritous, vinous, and malt" are the most generally treated of in such legislation. But the very fact that the legislature exercises and delegates ... power, under the head of "police regulations," to regulate ... such, is a sufficient basis for a similar exercise of the same power in like regulation of the sale of other intoxicants, whether of greater or less intoxicating effect; for, after all, it is the fact that the proscribed article is hurtful to health or peace or morals, and not the extent of its hurtful capacity, that justifies the governmental interference.* So, if the fact is that a given article in its nature is objectionable on any of the grounds named, it is properly within the police power of the state, and of the municipality when so delegated, to regulate it's use by exacting a license therefor, or even to prohibit it. Cider is "a strong drink," a beverage; in no sense a necessity more than is beer or wine. It is as distinctly a beverage as either beer or wine. True, it is not as intoxicating, but its classification as a beverage is as distinct as either of the others, and not the less certain.[7]

Opportunistic brewers, seeking to reclaim a market niche closed by the forces of temperance, trumpeted the relative beneficence of malt beverages [8] and attempted to slip under the radar of statutes regulating "intoxicating liquors" by brewing beverages with lower alcohol contents.[9] In *Bradford v. Jones*,[10] the Court addressed an ordinance, with a potential fine of $5 for noncompliance, enacted by the

---

tavern owner to allow an infant or female to remain on the premises for more than five minutes. *Id.*)

5. Fermented apple juice, also known as "hop jack," containing an average of between two (2) and eight (8) percent alcohol, less alcohol by concentration than most pre-prohibition ales or lagers. *See* Papazian, *The New Complete Joy of Home Brewing*, 2nd Edition, pp. 8–9, 161–165 (Avon Publishing, 1991);

6. *Town of Pikeville v. Huffman*, Ky., 112 Ky. 360, 65 S.W. 794 (1901).

7. *Id.* (emphasis added).

8. "The noblest philosophy of life, since extremes must, perforce exist, is compromise. Temperance, then, is the truest medium between *total* abstinence and excess; and malt liquors, above all, are the medium between ardent spirits and water." *1876 Brewers' Industrial Exhibition Essays on the Malt Liquor Question* 16 (Francis Hart & Co. 1876).

9. In the first decade of the 20th Century, the courts of various jurisdictions examined these low-alcohol beverages under various trade names in the context of statutes regulating "intoxicating beverages." *See, e.g. Commonwealth v. Henry*, 110 Va. 879, 65 S.E. 570 (Va.1909) ("Malt Beverage" and "Small Brew," which contained less than 2.25 percent alcohol); *State v. Fargo Bottling Works Co.*, 19 N.D. 396, 124 N.W. 387 (N.D.1910) ("Purity Malt," which contained 1.75 percent alcohol by volume); *Sawyer v. Botti*, 147 Iowa 453, 124 N.W. 787 (Iowa 1910) ("Justus beer" which contained less than 0.5 percent alcohol by volume); *Gourley v. Commonwealth*, 140 Ky. 221, 131 S.W. 34 (1910) ("Malt Mead"); *Ex Parte Townsend*, 64 Tex. Crim. 350, 144 S.W. 628 (1911) ("Haiwatha," which contained less than 2 percent alcohol).

10. 142 Ky. 820, 135 S.W. 290 (1911).

town of Jellico designed to regulate malt beverages containing alcohol under the heading of "soft drinks": "Any person or persons, or firms, or corporations, who shall engage in the business of selling soft drinks shall pay a license tax to the town treasurer of the town of Jellico of fifty dollars per annum, payable quarterly." [11] Bradford, a restauranteur, sought a writ to prohibit the local police judge from imposing the fine against him on the grounds that the license fee was unreasonable, arbitrary, and oppressive. The court held the ordinance a valid exercise of the town's delegated police power to the extent it regulated beverages containing a quantity of alcohol:

The words "soft drinks" are not defined by statute or by the ordinance; but in recent years they have come to have a well-known and popular use in this state, and are commonly understood to mean nonintoxicating beverages that are sold in places where there were formerly sold intoxicating liquors, and may be said to have come into use with the abolition of the barroom and other places where liquor was sold by licensed dealers. While including lemonade, soda water, mineral waters, and other innocent and harmless beverages that are and have been for years sold all over the country, they are generally used in reference to "malt mead," "near beer," and other alcoholic decoctions invented to take the place of intoxicating drinks. "Soft drinks" that contain any per cent. of alcohol are regarded as hurtful to the morals and health of the community, and their sale might well come within the control and regulation of the police power. But such "soft drinks" as lemonade, soda water, and mineral waters that are pure and wholesome, and contain no al-

cohol, are not detrimental to the public good, and their sale does not need police regulation or control.

. . .

It might be arbitrary and oppressive to fix the license fee for selling useful and pure mineral or health-giving waters at a sum that would virtually prohibit their sale, when it would not be arbitrary and oppressive to fix a license fee at a prohibitive figure for the sale of beverages that are not wholesome or necessary.[12]

The Court had a second opportunity to examine an attempt to regulate low-alcohol content beverages, in *Tolliver v. Blizzard*,[13] when it heard a constitutional challenge after the City of Olive Hill sought to regulate the sale of "soft drinks" by permitting the sale of only those "soft drinks" specified by ordinance:

That it shall be unlawful for any person or persons, corporations or firms, on and after the 17th day of May, 1910. To sell or conduct or operate a place for the sale, barter or loan, by retail or wholesale, of any proprietary or soft drinks, except lemonade, milkshake, soda water labeled pop and coca-cola, within the city limits of Olive Hill, Carter county, Kentucky.[14]

Tolliver, a restauranteur who sold, in addition to the nefarious "Malt Mead," lemon sours and sodas, challenged the ordinance. The Court dismissed the city council's argument that the statute was necessary to prevent some people from camouflaging alcoholic beverages within innocuous ones and declared the statute unreasonable and void:

The test in every case is: Is the prohibition . . . of the sale of a particular

11. *Id.*

12. *Id.* at 291.

13. 143 Ky. 773, 137 S.W. 509 (1911).

14. *Id.* The ordinance provided for a five dollar ($5) licensing fee and a fine of between twen-

ty five ($25) and one hundred ($100) dollars for noncompliance. In addition, it stated that "[a]ny or all other proprietary or so-called soft drinks, except what is mentioned in this ordinance, are by this ordinance prohibited from being sold in said city." *Id.* at 510.

article necessary to prevent the infliction of a public injury? It is not sufficient that the public sustains harm from a certain trade or employment as it is conducted by some engaged in it. Because many men engaged in the calling persist in so conducting the business that the public suffers, and their actions cannot otherwise be effectually controlled, is no justification for a law which prohibits an honest man from conducting the business in such a manner as not to inflict injury upon the public. Therefore the power of prohibition may not be invoked as to certain harmless drinks, merely because certain persons, under the guise of selling such drinks, may sell intoxicating liquors.

. . .

[L]et us examine the ordinance. It specifies certain soft drinks which may be sold. The sale of all other soft drinks is prohibited. Among the number might be enumerated several soft drinks that are absolutely harmless. It will not do to say that the city council is the arbiter of public taste. It cannot prescribe what harmless drinks shall, or shall not, be sold. Its power to prohibit is confined to those drinks which are harmful or deleterious to the public health and morals. The ordinance before us is not restricted in its application. It prohibits the sale of many harmless drinks, and is so broad in its scope and so discriminatory in its character as to constitute an unlawful interference with the liberty of the citizen, which includes, not merely the right to acquire property, but the right to buy and sell it. That being true, we conclude the ordinance is unreasonable and void.[15]

It is established jurisprudence in this Commonwealth, therefore, that the legislature's power to regulate a particular article under its police power rests on the presence, in whatever concentration, of a harmful substance. As hemp contains a quantity of THC, and Mr. Harrelson did not overcome the statute's presumption of constitutionality and prove that THC is harmless, the state may validly prohibit its possession. Accordingly, I would reverse the decisions of the Court of Appeals, the circuit court, and the district court and remand this matter to the district court for further proceedings consistent with this opinion.