RENDERED:  DECEMBER 17, 2020
TO BE PUBLISHED

# Supreme Court of Kentucky

2018-SC-0610-DG

DEPARTMENT FOR COMMUNITY BASED                                    APPELLANT
SERVICES, CABINET FOR HEALTH AND
FAMILY SERVICES


|  | ON REVIEW FROM COURT OF APPEALS |
| --- | --- |
| V. | NO. 2016-CA-1486 |
|  | MCLEAN CIRCUIT COURT NO. 14-CI-00048 |


REBECCA BAKER                                                            APPELLEE


**OPINION OF THE COURT BY JUSTICE LAMBERT**

**REVERSING AND VACATING**

The Department for Community Based Services, Cabinet for Health and Family Services (the Cabinet) appeals the Court of Appeals' holding that the Cabinet exceeded its statutory authority by investigating allegations that Rebecca Baker neglected children in her care.

After review, we reverse the Court of Appeals and further hold that the Cabinet did not meet its burden of proof to substantiate its allegations of neglect against Ms. Baker.

## I.   FACTUAL AND PROCEDURAL BACKGROUND

The facts of this case must necessarily be discussed in greater detail in Section II(B) of this opinion.  We therefore now recount only what is necessary

to provide context and an understanding of the procedural background of this case.

During the events at issue in this case, Ms. Baker worked for the Livermore Elementary School afterschool program. For three hours after school each day, Ms. Baker would supervise several young children until their parents came to pick them up. Ms. Baker was often the only adult present but would sometimes be joined by her supervisor Rebecca Atherton.

On January 30, 2013, there was a disciplinary incident during the afterschool program between two of the children. Ms. Baker reported the incident to the school's principal, Carrie Ellis, the next day. Ms. Ellis spoke with each of the children about the incident. During Ms. Ellis' discussion with the children, they revealed concerns about the afterschool program that were unrelated to the disciplinary incident. Ms. Ellis thereafter reported their statements the Cabinet.

The Cabinet investigated what Ms. Ellis reported, and thereafter substantiated findings of neglect against Ms. Baker. Ms. Baker appealed these findings and requested an administrative hearing on the matter.[1] After the administrative hearing, the hearing officer affirmed the Cabinet's findings of

---

[1] "An individual found by the Cabinet to have abused or neglected a child may appeal the Cabinet's finding through an administrative hearing in accordance with 922 Kentucky Administrative Regulation (KAR) 1:480. Such hearings are commonly referred to as 'CAPTA appeals,' as the Child Abuse Prevention and Treatment Act (CAPTA) requires such processes for states to maintain eligibility for funding under the act." Department of Community Based Services, Standards of Practice Online Manual, 30.2 CAPTA Appeals.

neglect and found that Ms. Baker should be placed on the federal registry of persons who have abused or neglected children.

Ms. Baker then appealed the hearing officer's finding to the McLean Circuit Court. Ms. Baker argued to the circuit court that the hearing officer's findings were not based on substantial evidence. Ms. Baker further asserted that the hearing officer's application of the statutory definition of "neglect" to what occurred in this case was error. The circuit court ultimately affirmed the hearing officer's findings.

Ms. Baker thereafter appealed to the Court of Appeals. She renewed the same arguments she had presented to the circuit court. However, instead of addressing Ms. Baker's arguments on the merits, the Court of Appeals *sua sponte* raised the issue of whether the Cabinet had the authority to investigate Ms. Baker in the first place.[2] The Court of Appeals held that the Cabinet lacked such authority, and reversed on that ground alone.[3] The Cabinet filed a petition for rehearing with the Court of Appeals, which was subsequently denied.

Consequently, this Court is now tasked with addressing two issues: (1) whether the Cabinet exceeded its statutory authority by investigating the allegations against Ms. Baker; and (2) whether there was substantial evidence to support the hearing officer's finding of neglect by Ms. Baker. After thorough

---

[2] *Baker v. Department for Community Based Services*, 2016-CA-001486-MR, 2018 WL 3090029, at *3-*5 (Ky. App. June 22, 2018).

[3] *Id.* at *5.

review of the record, we hold that the Cabinet did not exceed its authority by investigating Ms. Baker, but that it did not meet its burden of proof to substantiate its allegations of neglect against her.

## II. ANALYSIS

**A. The Cabinet did not exceed its statutory authority by investigating the allegations in this case.**

**i.) Ms. Baker was not a "person exercising custodial control or supervision" over the children in the afterschool program.**

As previously noted, the Court of Appeals held that the Cabinet lacked the statutory authority to investigate Ms. Baker. The Court of Appeals began by noting that a reviewing court may reverse the decision of an administrative body if "the agency's final order is…in excess of the statutory authority of the agency."[4] The administrative hearing officer found that

> there was a preponderance of the evidence that the well-being of children **under Ms. Baker's custodial control and supervision** were harmed, or threatened with harm, when they were not being adequately supervised by her when, by all accounts, they were able to conceal themselves from Ms. Baker in a small open school room and engage in sexual activity.[5]

The Court of Appeals held that Ms. Baker was not a person exercising custodial control or supervision over the children in the afterschool program, and therefore the Cabinet lacked authority to investigate the claims against her.

---

[4] *Id.* at *2. (citing Kentucky Revised Statute (KRS) 13B.150(2)).

[5] Hearing officer's Findings of Fact, Conclusions of Law, and Recommended Order, at 11 (emphasis added).

4

In reaching this conclusion, the Court of Appeals focused its analysis solely on KRS 620.030, KRS 620.040, and KRS 600.020, as those statutes were worded during the relevant time period in this case. KRS 620.030(1) stated in pertinent part that

> [i]f the cabinet receives a report of abuse or neglect allegedly committed by a person **other than a parent, guardian, or person exercising custodial control or supervision**, the cabinet shall refer the matter to the Commonwealth's attorney or the county attorney and the local law enforcement agency or the Department of Kentucky State Police.[6]

The Court of Appeals therefore concluded that the Cabinet may only investigate allegations of neglect when the alleged perpetrator is a "parent, guardian, or person exercising custodial control or supervision."[7] The court noted its conclusion was further bolstered by KRS 620.040, which states:

> (1)(a) **Upon receipt of a report alleging abuse or neglect by a parent, guardian, or person exercising custodial control or supervision**, pursuant to KRS 620.030(1) or (2), the recipient of the report shall immediately notify the cabinet or its designated representative, the local law enforcement agency or the Department of Kentucky State Police, and the Commonwealth's or county attorney of the receipt of the report unless they are the reporting source.
>
> (b) Based upon the allegation in the report, the cabinet shall immediately make an initial determination as to the risk of harm and immediate safety of the child. Based upon the level of risk determined, **the cabinet shall investigate the allegation** or accept the report for an assessment of family needs and, if appropriate, may provide or make referral to any community-based services necessary to reduce risk to the child and to

---

[6] (emphasis added).

[7] *Baker*, 2018 WL 3090029 at *3.

5

> provide family support. A report of sexual abuse shall be considered high risk and shall not be referred to any other community agency.[8]

The court accordingly went on to address whether Ms. Baker was a "person exercising custodial control or supervision" under the definition of that term as provided in KRS 600.020.[9] KRS 600.020(44) provided that a "[p]erson exercising custodial control or supervision means a person...that has assumed the role and responsibility of a parent or guardian for the child, but that does not necessarily have legal custody of the child[.]" The Court of Appeals held that, because Ms. Baker's role was more akin to a babysitter than a person exercising custodial control, the Cabinet exceeded its statutory authority by investigating her.[10]

We agree with the Court of Appeals' analysis only insofar as it held that Ms. Baker was not a person exercising custodial control or supervision over the children in the afterschool program. By all accounts, Ms. Baker was essentially a babysitter and had no custodial control or supervision over the children in the afterschool program.

However, we differ with the Court of Appeals' ultimate holding that the Cabinet had no authority to investigate the allegations of neglect in this case because there are other provisions in KRS Chapter 600-645 (the Kentucky

---

[8] *Id.* (emphasis added). We note that the Court of Appeals also cited KRS 620.040(3), but as that subsection is limited solely to "a report of *abuse*" and not neglect, it has no application in the case at bar.

[9] *Id.* at *4.

[10] *Id.*

6

Unified Juvenile Code) that authorized the Cabinet's investigation. In other words, the Court of Appeals only engaged in "part one" of what should have been a two-part analysis, and therein lies its error.

### ii.) Ms. Baker was both a "person in a position of authority" and "a person in a position of special trust."

The statutory provision that the Court of Appeals failed to consider is KRS 620.050(4). That statute, as it read during the events in this case, states:

> **Upon receipt of a report of an abused, neglected, or dependent child pursuant to this chapter, the cabinet** as the designated agency or its delegated representative **shall initiate a prompt investigation** or assessment of family needs, take necessary action, and shall offer protective services toward safeguarding the welfare of the child. The cabinet shall work toward preventing further dependency, neglect, or abuse of the child or any other child under the same care, and preserve and strengthen family life, where possible, by enhancing parental capacity for adequate child care.

The plain language of this statue not only authorizes, but mandates that the Cabinet investigate reports of a neglected child. In turn, the definition of a neglected child was:

> (1) a child whose health or welfare is harmed or threatened with harm when:
>
> > (a) His or her parent, guardian, **person in a position of authority or special trust, as defined in KRS 532.045**, or other person exercising custodial control or supervision of the child:
> >
> > > 8. Does not provide the child with adequate…supervision…necessary for the child's well-being.[11]

---

[11] KRS 600.020(1)(a)8 (emphasis added).

7

"A person in a position of authority" and "a person in a position of special trust," are defined in KRS 532.045 as:

> (a) "Position of authority" means **but is not limited to** the position occupied by a biological parent, adoptive parent, stepparent, foster parent, relative, household member, adult youth leader, recreational staff, or volunteer who is an adult, adult athletic manager, adult coach, teacher, **classified school employee,** certified school employee, counselor, staff, or volunteer for either a residential treatment facility, a holding facility as defined in KRS 600.020, or a detention facility as defined in KRS 520.010(4), staff or volunteer with a youth services organization, religious leader, health-care provider, or employer;
>
> (b) "Position of special trust" means a position occupied by a person in a position of authority who by reason of that position is able to exercise undue influence over the minor[.][12]

The Cabinet argues before this Court that Ms. Baker could be considered a "classified school employee" under KRS 161.011(1)(a): "an employee of a local district who is not required to have certification for [her] position." But, KRS 532.045 itself does not provide a cross reference to that definition. Further, it was unclear from the record whether Ms. Baker was required to have certification for her position. We are therefore unwilling to say with any certainty that she would qualify as a classified school employee.

However, the statutory list of persons who are considered to be in a position of authority is expressly non-exhaustive. So, even if Ms. Baker is not a classified school employee, she may still be properly considered as a person

---

[12] (emphasis added).

in a position of authority. We hold that she was. We base this holding on the fact that her position would not be out of place with other positions expressly listed in the statute. We also base this holding on the common sense understanding of the term "position of authority." Ms. Baker was often the only adult supervising several small children. She had the ability to punish them by putting them in time out and was responsible for reporting any disciplinary incidents that occurred between the children. She is therefore properly considered as a person in a position of authority.

Likewise, Ms. Baker could also be considered a person in position of special trust. Again, she was often the only adult supervising small children. She could therefore, theoretically, use her position of authority to exercise undue influence on those children.

In summation, the Cabinet has a statutory duty under KRS 620.050(4) to investigate reports that a child has been neglected. A neglected child is a child whose health or welfare is harmed or threatened when a person in a position of authority or special trust does not provide the child with adequate supervision necessary to that child's well-being. Ms. Baker could be considered both a person in a position of authority and a person in a position of special trust. Therefore, the Cabinet did not exceed its statutory authority by investigating her and the Court of Appeals' holding to the contrary was error.

As a final note, neither of the statutes relied upon by the Court of Appeals limit the Cabinet's investigative authority. Again, KRS 620.030(1) states that

9

> [i]f the cabinet receives a report of abuse or neglect allegedly committed by a person other than a parent, guardian, or person exercising custodial control or supervision, the cabinet shall refer the matter to the Commonwealth's attorney or the county attorney and the local law enforcement agency or the Department of Kentucky State Police.

But that statute does not say, for example, "after referring the matter to law enforcement the Cabinet shall immediately cease its investigation." Likewise, there is no such express limitation of the Cabinet's investigatory authority in KRS 620.040.

Accordingly, based on the foregoing, we reverse.

## B. The Cabinet did not meet its burden of proof to substantiate its allegation of neglect by Ms. Baker.

Because the Court of Appeals held *sua sponte* that the Cabinet exceeded its authority by investigating Ms. Baker, it did not reach the merits of the issue the parties actually briefed. Namely, whether the hearing officer's order affirming the substantiation of the neglect charges against Ms. Baker was based on substantial evidence. "Kentucky Courts have long held that judicial review of administrative action is concerned with the question of arbitrariness.... Unless action taken by an administrative agency is supported by substantial evidence it is arbitrary."[13] Here, we need not remand this case to the Court of Appeals because we are equally suited to determine the sufficiency of the evidence based on a closed record as the Court of Appeals

---

[13] *Wasson v. Kentucky State Police*, 542 S.W.3d 300, 302 (Ky. App. 2018) (citing *American Beauty Homes Corp. v. Louisville and Jefferson Cty Planning and Zoning Comm'n,* 379 S.W.2d 450, 456 (Ky. 1964)) (internal quotation marks omitted).

10

would be.[14]  As such, a remand would exact the significant cost of further delay for little benefit.  Thus, we will consider the sufficiency of the evidence of the neglect charge against Ms. Baker.

The specific allegation leveled against Ms. Baker by the Cabinet was that she neglected the children in the afterschool program by failing to "provide adequate supervision to the students in the afterschool program which resulted in...some sexual touching [between the children] while in the afterschool room."[15]  This was the allegation affirmed by the hearing officer, who found:

> Based on the evidence presented, it is more likely than not that Rebecca Jo Baker neglected children as defined by KRS 600.020(1)(h).[16]  Turning to the incident which trigged the referral that was made to DCBS and formed the basis for its subsequent investigation of same, there was a preponderance of the evidence that the well-being of children under Ms. Baker's custodial control and supervision were harmed, or threatened with harm, when they were not being adequately supervised by her when, by all accounts, they were able to conceal themselves from Ms. Baker in a small open school room and engage in sexual activity.[17]

During an administrative hearing on an allegation of neglect, the Cabinet bears the burden of proving neglect occurred by a preponderance of the

---

[14] In addition, during oral argument for this case the Cabinet conceded that this Court could reach the merits of the substantial evidence issue if we so chose.

[15] The Cabinet's "Substantiated Investigation Notification Letter" to Ms. Baker.

[16] The hearing officer cited the wrong subsection of KRS 600.020.  It appears that he intended to cite KRS 600.020(1)(a)8.

[17] Hearing officer's Findings of Fact, Conclusions of Law, and Recommended Order, at 10-11.

evidence.[18] This means that the evidence must be "sufficient to conclude that it is more likely than not that an alleged perpetrator committed an act of child...neglect[.]"[19] Neglect, in turn, is defined under these circumstances as failing to "provide [a] child with adequate...supervision...necessary for the child's well-being."[20] Finally, this Court is without authority to hold that the hearing officer's findings were arbitrary unless those findings were not supported by substantial evidence.[21] Specifically, "evidence of substance and relevant consequence having the fitness to induce conviction in the minds of reasonable men."[22]

During the administrative hearing in this case, the Cabinet called Carrie Ellis, the principal, and two social workers, Jaquelin Hoppe and Retina DePriest. Ms. Baker called Rebecca Atherton, her supervisor, and also testified on her own behalf. None of the children involved testified. The only two witnesses from the afterschool program were Ms. Baker and Ms. Atherton. Ms. Ellis testified that she has no direct involvement with the afterschool program apart from addressing disciplinary issues that arise therein. Based on the testimony of those witnesses, and the Cabinet's Continuous Quality Assessment (CQA) Report,[23] the evidence was as follows.

---

[18] KRS 13B.090(7).

[19] 922 KAR 1:330 (12).

[20] KRS 600.020(1)(a)8.

[21] *See Kentucky Ret. Sys. v. Bowens*, 281 S.W.3d 776, 780 (Ky. 2009).

[22] *Id.*

[23] The CQA Report was entered into evidence as the Cabinet's Exhibit 2.

At the time of these events, Ms. Baker was a forty-year-old high school graduate with one year of vocational training in commercial foods. She had no criminal record and no previous charges had been filed against her by the Cabinet. She had worked for the afterschool program for about five years. The afterschool program occurred from 3pm to 6pm, and Ms. Baker was often the only adult present. Occasionally Ms. Baker's supervisor, Ms. Atherton, was present but it was unclear how often. There were ten children who were "regulars" in the program, but that number fluctuated. All of the children in the program were in fifth grade and below. The afterschool program room was one room with several tables, cubbies, and bookshelves.

On January 30, 2013, an accreditor was visiting the afterschool program for an evaluation.[24] Ms. Baker was present, as well as twelve children. Ms. Baker testified that as she was being interviewed by the accreditor, a child approached her and told her another child was sitting in her cubby crying. Ms. Baker excused herself from the interview to check on the child, a ten-year-old female, A.M. A.M. told Ms. Baker that another child, a five-year-old male, C.W., had kicked her in her privates. Ms. Baker asked C.W. why he kicked A.M., and he responded that he wanted to see if it hurts girls as much as it does boys. Ms. Baker put C.W. in time out, calmed A.M. down, and resumed the interview with the accreditor.

---

[24] Ms. Atherton testified that they participate in the accreditation program because it is essentially a "step-above" licensure, and makes the program look better than one that is only licensed.

13

Ms. Baker later called Ms. Atherton to tell her about the kicking incident. Ms. Atherton advised her to write down what happened, and tell the principal, Ms. Ellis, about it the next day. When Ms. Baker informed Ms. Ellis the next day, Ms. Ellis brought both A.M. and C.W. into her office to discuss it. When Ms. Ellis asked C.W. why he did it, C.W. said that another child, six-year-old C.M., made him do it. C.W. then said that C.M. "makes him do all kinds of things" and that C.M. "wants him (C.W.) to touch him (C.M.)" At that point Ms. Ellis had A.M. leave her office. As she was leaving, A.M. said to Ms. Ellis, "yeah, you need to ask him about all the nasty things him and [C.M.] does (sic)."[25] A.M. was later interviewed by Ms. DePriest at her home. Ms. DePriest asked A.M. to explain what she meant by C.W. and C.M. doing "nasty things." Ms. DePriest's CQA Report states:

> [A.M.] reported that [C.W.] and [C.M.] hide under the tables at the Afterschool Program and do "nasty things." When asked about "nasty things," she stated that they have stuffed animals and will pretend that it is their girlfriend and do boyfriend/girlfriend things. When asked what they do, she reported that they will kiss and touch them and stated that they are nasty...When asked if she ever told Ms. Baker about the nasty things that [C.W.] and [C.M] does (sic) in the Afterschool Program, she reported that she had went to Ms. Baker with [K.W.] (C.W.'s older sister) and K.W. would tell on them. She stated that Ms. Baker would tell them to get out from under the tables and to stop.[26]

---

[25] CQA Report, at 7.

[26] *Id.* at 4.

14

As the foregoing paragraph mentions, the boys' behavior with the stuffed animals was corroborated by C.W.'s sister K.W., who was in fourth grade. K.W. was given a forensic interview at a child advocacy center. During the interview

> [K.W.] reported that [C.M.] pretends to have a girlfriend and does "nasty things" with stuffed animals in the Afterschool Program. [K.W.] reported that [C.M.] tells her brother to pretend that the stuffed animals are their girlfriends and shows her brother how to do the "nasty things." When asked about the "nasty things," she stated that they kiss them and touch them in their private areas...She stated that she and her friend [A.M.] tell Ms. Baker all the time. She reported that Ms. Baker will tell [C.M.] and her brother to get out from under the table[.][27]

Neither K.W. nor A.M. ever reported witnessing [C.W.] and [C.M.] touch *each other* inappropriately.

The Cabinet's "Substantiated Investigation Notification Letter" to Ms. Baker stated

> The factual basis for the finding of abuse or neglect (KRS 600.020(1)) is as follows...The boys admitted to some sexual touching while in the afterschool room and this was also witnessed by two other students that confirmed this behavior took place in the afterschool room. The other students had reported this behavior to Ms. Baker but she never notified [C.W.] or [C.M.]'s parents of the behaviors.

On cross-examination, Ms. DePriest readily agreed that the entire foregoing paragraph was in relation to the boys' behavior with the stuffed animals and did not have anything to do with C.W. and C.M. touching *each other* inappropriately.

---

[27] *Id.* at 10.

The Cabinet also presented evidence of another incident with C.W. and C.M. that had nothing to do with the boys touching one another inappropriately. The incident was described in the CQA report as follows

> [Ms. Baker] reported another incident in which the boys had moved a shelf away from the wall and was (sic) lying behind the shelf. She stated that she was helping the students in the computer area, she turned to scan the room, and observed two feet on the floor behind the shelf. She reported that she walked over [to] the shelf and observed [C.M.] lying face down with [C.W.] lying face down directly on top of [C.M.]...She reported/illustrated that the boys' bodies were completely parallel except for their feet which were lying beside each other...She stated that [she] asked the boys what they were doing. She reported that [C.W.] stated, "We're brothers; we're camping; we love each other."...She stated that she made them get out from behind the shelf and made them move the furniture back to their original locations.[28]

There was no evidence that C.W. and C.M. touched each other inappropriately or with sexual intent during this incident.

The bookshelf itself was brought into the administrative hearing. The bookshelf brought to the hearing was described by the hearing officer as "[a] very small wooden bookcase...approximately 2 ft. x 18 inches and is very easily capable of being move or pushed on carpeting by a five-year-old child."[29] Ms. Baker positively identified it as the bookshelf C.W. and C.M. had moved. But both Ms. Hoppe and Ms. DePriest said it was not the same bookshelf they observed in the afterschool room during their investigation. Both Ms. Hoppe

---

[28] *Id.* at 5-6.

[29] Hearing officer's Findings of Fact, Conclusions of Law, and Recommended Order, at 8, footnote 3.

and Ms. DePriest said the bookshelf they saw was "taller" and very difficult to move.  Ms. DePriest's CQA report, described the bookshelf as being "30 inches in width, 47 inches in height, and 12 inches."[30]  The report also states that "[w]ith Ms. Baker directing [Ms. DePriest], [Ms. DePriest] moved the furnishings in this area as she observed it (sic) to be moved on the day of the incident."[31]  The report does not note that the bookshelf was difficult for Ms. DePriest to move.

The hearing officer also stated in his findings of fact that "Ms. Atherton described occurrences she observed in the afterschool program which can only best be described as out-of-control unruly children (e.g. children fighting, climbing walls and trying to swing on cords)."[32]  This finding is misleading without its proper context.  Ms. Atherton testified during her direct examination that they had some problems with C.W. prior to the kicking incident with A.M.  She was asked to explain what she meant by that on cross-examination.  She replied that "[C.W. and C.M.] would fight, they get into trouble.  One day I was there they had their superman capes on and were trying to climb the walls and swing off cords, and, you know, typical little boy stuff."  There was no evidence that the afterschool program in general had an unruly atmosphere; the evidence showed that seemingly all the disciplinary issues occurring in the afterschool program revolved around two children: C.W.

---

[30] CQA Report, at 6.

[31] *Id.*

[32] Hearing officer's Findings of Fact, Conclusions of Law, and Recommended Order, at 8.

and C.M.  In fact, prior to the kicking incident, in the five years Ms. Baker worked there, she only had to report one other disciplinary incident to Ms. Ellis.

Finally, regarding the evidence that C.M. and C.W. touched each other inappropriately, which was the basis for the neglect allegation, we reiterate for clarity that this issue first came to light when C.W. was talking to Ms. Ellis about the kicking incident with A.M.  Ms. Ellis stated that during that discussion C.W. told her that "[C.M.] will want him (C.W.) to touch C.M.'s private area."[33]

Five-year-old C.W. was thereafter interviewed by Ms. Hoppe.  Ms. Hoppe's report of that interview states

> [C.W.] stated that [C.M.] has touched him in his private area.  He stated, "[C.M.] wanted me to hide under the Lego Table and touch him."  [C.W.] reported that he and [C.M] were under the Lego Table the first time [C.M.] touched him…in his private area…[C.W.] stated "I touch on clothes."  He stated that [C.M.] will unbutton his pants and wants him to touch under his clothes…When asked how many times [C.M.] had touched him, he stated that he had touched him "1,146 times."  When asked how many times he had touched [C.M.], he reported that he had touched him one time.[34]

The CQA Report also reflects that both K.W. and C.W. participated in a forensic interview at a child advocacy center.  However, while K.W.'s forensic interview is discussed in the report, C.W.'s is not.

---

[33] *Id.* at 7.

[34] *Id.* at 3.

Six-year-old C.M. also participated in a forensic interview at a child advocacy center. Regarding the interview, the CQA Report states:

> When asked if he knew why he was at the CAC on this date, [C.M.] was observed to drop his head and to not respond initially. He then reported that he was there to talk about the things that happened at the Afterschool Program. When asked what happened, he stated that [C.W.] tried to get him to touch his privates. When asked if he touched [C.W.'s] privates, he denied that he had touched [C.W.'s] privates but reported that [C.W.] had touched his [C.M.'s] private. He reported that it only happened once. [C.M.] stated that he did not like it and continued to state that [C.W.] only touched him once and was on top of his clothes. When asked if he told anyone, he stated no. When asked if anyone seen (sic) it, he stated no. He stated that Ms. Baker was sitting at her desk, and that he and [C.W.] were behind Ms. Baker's desk under the Lego table.[35]

None of the children in the program ever reported seeing C.W. and C.M. touch each other inappropriately. And, the evidence was undisputed that Ms. Baker had no idea that the inappropriate touching was allegedly happening until C.W. told Ms. Ellis about it after the kicking incident. Therefore, the **only** actual evidence that any inappropriate touching happened between C.W. and C.M. came from the boys themselves. C.W., a five-year-old, said that C.M. touched him 1,146 times, the first time being under the Lego table, and that he had only touched C.M. once on top of C.M.'s clothing. C.M., a six-year-old, said that he had never touched C.W.'s privates, but that C.W. had touched his privates once, over his clothes, while they were under the Lego table.

---

[35] *Id.* at 16.

In addition to C.W. and C.M.'s statements being inconsistent with one another, neither of the boys testified. Therefore, their alleged version of events was introduced solely through hearsay. During an administrative hearing for an allegation of neglect "[h]earsay evidence may be admissible, if it is the type of evidence that reasonable and prudent persons would rely on in their daily affairs, but it shall not be sufficient in itself to support an agency's findings of facts unless it would be admissible over objections in civil actions."[36]

The only consistent thread between the boys' version of events was that at least one instance of the touching was under the Lego table in the afterschool room. The Lego table was brought into the hearing, and Ms. DePriest acknowledged on cross-examination that, based on C.W. and C.M.'s respective sizes, it would have been "physically impossible" for them to get their whole bodies under the Lego table. The Lego table was described as being "not quite two feet tall" and "maybe a yard long," while C.W. was 45.5 inches tall, C.M. was 47.5 inches tall.[37] Ms. Baker acknowledged that she could not see under the Lego table when it was pushed against her desk, but she was adamant that she could see under the other tables in the room. She also explained that the only time the Lego table would be pushed against her desk was to make room for the children to have "dance time."

---

[36] KRS 13B.090(1).

[37] CQA Report, at 17-18.

We therefore hold that the Cabinet failed prove that it was more likely than not[38] that Ms. Baker failed to provide a child adequate supervision necessary for the child's well-being.[39] The only evidence presented by the Cabinet that the boys touched each other sexually was unreliable and inconsistent hearsay. No witness testified that the touching was ever reported to Ms. Baker. Further, all of the other incidents introduced by the Cabinet demonstrated that Ms. Baker *was* providing adequate supervision. According to K.W., A.M., and Ms. Baker herself, whenever she saw C.W. and C.M. under tables, she would make them get out from under them. And, regarding the other incident, as soon as she saw that C.W. and C.M. were behind the bookcase she immediately made them get out from behind it. There was no evidence that the afterschool room had an unruly atmosphere in general, and the evidence was undisputed that Ms. Baker was not aware that the alleged touching was occurring.

We therefore reverse the Cabinet's substantiation of neglect and order the Cabinet to have Ms. Baker's name removed from the federal registry of persons who have neglected or abused children.

### III.    CONCLUSION

Based on the foregoing, we reverse and vacate the finding of neglect against Ms. Baker.

All sitting. Minton, C.J.; Hughes and VanMeter, JJ., concur.

---

[38] 922 KAR 1:330 (12).

[39] KRS 600.020(1)(a)8.

21

WRIGHT, J., CONCURRING IN PART AND DISSENTING IN PART: While I concur with the portion of the majority's holding reversing the Court of Appeals, I respectfully dissent as to the latter part of the opinion which vacates the trial court based on a supposed lack of substantial evidence.

Ms. Baker supervised between ten and fifteen children in an afterschool program in a local elementary school. After one child in the program kicked another, doubling her over and bringing her to tears, Baker notified the school's principal about the disciplinary issue. When the principal talked to the children involved, they alerted her to inappropriate sexual touching between some of the young children in the program. After the students raised these allegations, the principal interviewed additional students in the afterschool program, who added to her concern. The principal then called the Cabinet for Health and Family Services with a report concerning what the children had told her.

Before both the circuit court and Court of Appeals, Baker argued the Cabinet's findings were only supported by inadmissible hearsay evidence in violation of KRS 13B.090(1), which provides:

> In an administrative hearing, findings of fact shall be based exclusively on the evidence on the record. The hearing officer shall exclude evidence that is irrelevant, immaterial, unduly repetitious, or excludable on constitutional or statutory grounds or on the basis of evidentiary privilege recognized in the courts of this Commonwealth. Hearsay evidence may be admissible, if it is the type of evidence that reasonable and prudent persons would rely on in their daily affairs, but it shall not be sufficient in itself to support an agency's findings of facts unless it would be admissible over objections in civil actions.

22

Baker asserts that "virtually all of the testimony provided by [the Cabinet's] witnesses consisted of hearsay statements" made by the children in the afterschool program, as recounted by other witnesses.

The evidence of record includes statements made by children in the afterschool program. C.W.'s older sister and another girl in the afterschool program told adults during interviews that they previously told Ms. Baker about C.W. and C.M. doing "nasty" things to the stuffed animals under the tables on numerous occasions. According to the girls, C.W. and C.M. would pretend the stuffed animals were their girlfriends and would kiss them and touch their private areas. Reports of this nature would raise sufficient concern of possible sexual abuse that the law would require Ms. Baker to report the incident for investigation. She failed to report the possible sexual abuse to any authority.

It is true that one of the children told a social worker that another child had touched him inappropriately more than one thousand times. As the circuit court noted, while this statement alone would not be considered credible by a reasonable person, the child also provided additional details. In particular, he gave specific details about where on his body the touching occurred and where in the room he and the other child were during the touching. He also stated he touched the other child's "private area" once. This child gave largely consistent statements both to the social worker and the principal of his school.

23

The other child (the one the first child accused of touching him in excess of one thousand times) was interviewed at a child advocacy center. He denied ever touching the other boy inappropriately, but he did confirm the child had touched his "private" once. Notably, *both* boys indicated they had either touched or been touched by the other under the "Lego® table." It is certainly telling that, while the boys' stories differed in other respects, both identified the same location for inappropriate touching. When these children's statements are viewed together, the evidence "is the type of evidence that reasonable and prudent persons would rely on in their daily affairs." KRS 13B.090(1). Therefore, though hearsay, they were admissible in the administrative hearing.

While much of the testimony was hearsay—as Baker asserts—not all of it was. The hearing officer also considered the non-hearsay testimony of two social workers and the principal concerning their observations of the afterschool room. Between the three, testimony concerning furniture in the room the boys say they moved and hid behind, the size of the room, and the visibility in the room was elicited. Baker also made statements against her interest to the principal which would have been "admissible over objection in [a] civil action[]." KRS 13B.090(1). Baker's own witnesses (her supervisor and herself) also provided some of the evidence on which the hearing officer relied in substantiating the neglect allegations. Baker stated she could not see certain areas of the room while seated at her desk—specifically an area in which one of the boys alleged the improper touching had occurred. Baker

24

testified that the 2 young boys moved the case where an alleged incident occurred within seconds. Later testimony was that 2 grown women were unable to move it in 2 minutes.  Baker's supervisor testified to observing an unruly atmosphere in the room in which children were attempting to swing from cords and climb walls.  Although the majority indicates there is no evidence that the room had an unruly atmosphere on more than one occasion, I would point out that the trial court was in the best position to observe the witnesses and evaluate their credibility—thus the need for use of the substantial evidence standard on appeal.

"[T]he appellate court's role is confined to determining whether those facts support the trial judge's legal conclusion." *Commonwealth v. Deloney*, 20 S.W.3d 471, 473–74 (Ky. 2000).  "'Substantial evidence' means evidence of substance and relevant consequence having the fitness to induce conviction in the minds of reasonable men." *Owens–Corning Fiberglas Corp. v. Golightly,* 976 S.W.2d 409, 414 (Ky.1998) (citing *Kentucky State Racing Comm'n v. Fuller,* 481 S.W.2d 298, 308 (Ky.1972)).  "Mere doubt as to the correctness of a finding would not justify reversal, and the appellate court does not consider and weigh evidence de novo." *Commonwealth v. Harrelson,* 14 S.W.3d 541, 548–49 (Ky. 2000).

Between the hearsay statements properly admissible under KRS 13B.090(1), the non-hearsay statements, and the admissions, the hearing officer based his substantiation of the allegations that Baker had neglected

children in her care on substantial evidence. Therefore, the hearing officer had sufficient evidence before him to conclude the children engaged in inappropriate sexual touching due to Baker's failure to properly supervise them.

Keller and Nickell, JJ., join.

COUNSEL FOR APPELLANTS:

Mona Sabie Womack
Kristina Abel Fulkerson
Cabinet for Health and Family Services
Office of Legal Services

Tiffany Lorraine Yahr
Cabinet for Health and Family Services

Matthew Kleinert
Assistant Attorney General

COUNSEL FOR APPELLEE:

Daniel Joseph Sherman Jr.
Yonts, Sherman & Driskill