# IMPORTANT NOTICE
## NOT TO BE PUBLISHED OPINION

THIS OPINION IS DESIGNATED "NOT TO BE PUBLISHED." PURSUANT TO THE RULES OF CIVIL PROCEDURE PROMULGATED BY THE SUPREME COURT, RAP 40(D), THIS OPINION IS NOT TO BE PUBLISHED AND SHALL NOT BE CITED OR USED AS BINDING PRECEDENT IN ANY OTHER CASE IN ANY COURT OF THIS STATE; HOWEVER, UNPUBLISHED KENTUCKY APPELLATE DECISIONS, RENDERED AFTER JANUARY 1, 2003, MAY BE CITED FOR CONSIDERATION BY THE COURT IF THERE IS NO PUBLISHED OPINION THAT WOULD ADEQUATELY ADDRESS THE ISSUE BEFORE THE COURT. OPINIONS CITED FOR CONSIDERATION BY THE COURT SHALL BE SET OUT AS AN UNPUBLISHED DECISION IN THE FILED DOCUMENT AND A COPY OF THE ENTIRE DECISION SHALL BE TENDERED ALONG WITH THE DOCUMENT TO THE COURT AND ALL PARTIES TO THE ACTION.

RENDERED: MARCH 20, 2025
NOT TO BE PUBLISHED

# Supreme Court of Kentucky

2023-SC-0333-MR

LAUREN BAKER                                                APPELLANT

V.

ON APPEAL FROM KENTON CIRCUIT COURT
HONORABLE MARY K. MOLLOY, JUDGE
NO. 21-CR-00491

COMMONWEALTH OF KENTUCKY                           APPELLEE

**MEMORANDUM OPINION OF THE COURT**

**<u>AFFIRMING</u>**

Lauren Baker was convicted of wanton murder, importing fentanyl, and two counts of trafficking in a controlled substance in the first degree. She was sentenced to a total of thirty-three years' imprisonment. Baker now appeals the decision of the Kenton Circuit Court.

## I. BACKGROUND

Baker had been abusing drugs for much of her adult life, caught in the cycle of recovering for a time with the help of methadone treatments only to relapse. In the months leading up to March 18, 2021, Baker had started to use fentanyl again. When Baker received her federal stimulus check in March 2021, she planned to use $1,200 of it to purchase almost an ounce of fentanyl from a drug dealer located in Cincinnati, Ohio. Baker made arrangements with

Shyann Holliman and Shyann's mother, Dana Bright, to make the drive from Ludlow, Kentucky to Cincinnati on March 13, 2021.[1]  Baker directed Shyann to an unspecified location.  Once there, Baker picked up the fentanyl, and the three women drove back to Ludlow.  Baker paid Shyann around $60 for driving and gave about half a gram of the fentanyl to Dana to give to her other daughter, Sierra Holliman.

By March 18, 2021, Baker was already running low on the fentanyl she had just purchased but thought she could stretch it for a few days until she could get more.  That morning, Baker woke up around 10:20 a.m. in the home she shared with Edwin Suda and her three children including her toddler, Jaxon.[2]  She had her mother drive her to the New Season Covington Metro Treatment Center to pick up her daily dose of methadone, which was increased that morning due to Baker complaining of withdrawal symptoms.[3]  When she returned home from the methadone clinic, Edwin and Jaxon were still asleep in the upstairs bedroom, and she went back to sleep in her bedroom downstairs.[4]  Baker woke up again, injected a shot of fentanyl but did not go back to sleep.

---

[1] At trial, Shyann testified that they went to Cincinnati on March 15, 2021.

[2] Baker's two older children were living with Baker's mother on March 18, 2021. Jaxon is Edwin's only child with Baker.

[3] Baker had recently discovered she was pregnant with her fourth child, and pregnant women can metabolize methadone faster than other individuals.

[4] The information Baker gave in her interview with police and Edwin's testimony at trial conflict here.  Edwin testified that he had left the morning of March 18, 2021, at around 9 a.m. or 10 a.m. to go complete his first side job but returned home soon after that because the other person did not show up to the job.  Edwin stated that Jaxon stayed with Baker, and both were awake when he left and returned home.

At around 1:30 p.m., Edwin left the residence to complete a side job.[5] He left Jaxon with Baker in her downstairs bedroom, and the two eventually settled down for a nap.

Baker woke up from the nap around 3:30 p.m. and saw Jaxon sprawled across her lap, unresponsive. Baker noticed that her purse, her fentanyl, and other paraphernalia were strewn across her bed. Edwin had returned from his side job around 3:00 p.m. and was in the basement when he heard Baker screaming Jaxon's name. He ran to her bedroom, called 911, and gave Baker a dose of Narcan®[6] to administer to Jaxon while she performed CPR on him.

The fire department and law enforcement arrived on the scene just minutes after Edwin called 911. When Fire Chief Michael Steward arrived at Baker's home, he located Jaxon inside the downstairs bedroom of the home. Jaxon was not breathing and had started to turn blue. Chief Steward rushed Jaxon outside to a waiting ambulance, and he was transported to Cincinnati Children's Hospital where he was ultimately pronounced dead. While Jaxon was being transported to the hospital, officers started to collect syringes, caps, the purse, the Narcan® packaging, and any other evidence from the scene.

---

[5] Edwin testified that this was the second side job he left to complete the day of March 18, 2021, but Baker stated in her interview that this was the first time Edwin left the house.

[6] "NARCAN® Nasal Spray was designed to rapidly reverse the effects of a life-threatening opioid emergency. It is used to revive someone during an overdose from many prescription pain medications or street drugs such as heroin and is available as an over-the-counter treatment. NARCAN® Nasal Spray is safe to administer to people of all ages." *FAQS*, WWW.NARCAN.COM, https://narcan.com/en/frequently-asked-questions (last visited February 28, 2025).

Baker did not testify at trial, but the jury viewed a video recording of her interview with law enforcement. In the interview, she described her method for storing her fentanyl: inside a plastic bag, placed inside a cigarette box, then placed inside a pouch, which was ultimately placed inside of a purse that zipped shut. Baker would then tie the purse around the headboard of her bed and place it between the wall and the bed. She stated that the only way Jaxon could have gotten to her fentanyl was if he got into her purse, even though she was adamant about putting the fentanyl and other materials away. As far as Baker knew, Edwin was not in the house when Jaxon got into her fentanyl. Baker expressed that Edwin does not use her drugs and that she assumed he kept his drugs in the basement of the house they shared. During Edwin's interview with police, also recorded and played for the jury, he stated that he kept his paraphernalia mainly in the basement. He further testified at trial that he did not pay attention to where Baker kept her drugs.

At trial, toxicology reports for both Jaxon and Baker were discussed. Jaxon's toxicology lab results were positive for fentanyl and naltrexone. Naltrexone indicated the Narcan® Baker had administered to him. Jaxon's fentanyl concentration was 21.4 nanograms per milliliter. A fentanyl concentration 3 nanograms per milliliter becomes deadly in an adult who has not built up a tolerance to fentanyl. There were no fentanyl metabolites[7] reported in his toxicology lab, suggesting that Jaxon perished quickly after

---

[7] Fentanyl metabolites would have been present in Jaxon's toxicology report if his body had had time to break down the fentanyl he ingested.

4

ingesting the fentanyl. Baker's toxicology lab results confirmed her fentanyl concentration was 26.6 nanograms per milliliter, which suggested consistent use of the drug and a high tolerance to it. There were also fentanyl metabolites, methadone, methadone metabolites, and cocaine metabolites reported in her toxicology lab.

Jaxon's cause of death was determined to be acute fentanyl intoxication. His lungs were filled with fluid and froth that accumulated from Jaxon's attempts to get a breath of air and failing. His brain had swollen due to lack of oxygen. The medical examiner determined his manner of death to be homicide because there was an inherently dangerous substance accessible to Jaxon, which was no different than if he had access to a gun, a flame, or a knife. In the medical examiner's opinion, Jaxon was able to access something he should not have had access to that resulted in his death.

At trial, the defense's only witness, Dr. Kelly Clark, testified about Opioid Use Disorder (OUD) and its effects on Baker; methadone treatment and how Baker's was not working; and the stigma surrounding an OUD diagnosis. It was Baker's argument that she did not wantonly murder Jaxon because her wanton actions did not manifest an extreme indifference to the value of human life. Furthermore, Baker alluded to discrepancies in Edwin's police interview and his testimony at trial, pointing out multiple times that Edwin was unaccounted for between 3:00 p.m., when he returned home from work, and 3:30 p.m., when Baker found Jaxon unresponsive. The jury found Baker guilty of wanton murder, importing fentanyl, and trafficking in a controlled substance

in the first degree on two counts.  Baker now appeals.  Additional facts will be

developed as needed.

## II. ANALYSIS

Baker raises four arguments on appeal.  Baker first argues that the trial

court erred when it overruled her motion for a directed verdict on the charge of

murder.  Second, Baker argues the trial court erred when it allowed reference

to information contained in Cabinet for Health and Family Services (CHFS)

records during the Commonwealth's cross-examination of her expert witness

and that the trial court thereafter failed to give an admonishment under KRE[8]

703(b).  Third, Baker argues that the trial court erred when it did not instruct

the jury on reckless homicide.  Lastly, Baker asserts that all the above errors

amount to cumulative and reversible error.

### A. The trial court did not err when it overruled Baker's motion for directed verdict.

Baker contends the trial court erred when it did not grant her motion for

a directed verdict on the count of wanton murder.  She argues that it was

clearly unreasonable for the jury to find her guilty of wanton murder because

the evidence presented by the Commonwealth did not support the finding that

her wanton actions manifested an extreme indifference to human life.  Baker

claims that the evidence only sustained a finding of wantonness, which alone is

not enough to support a wanton murder conviction.  She asserts that the fact

that she took so many precautions to keep Jaxon and her other children away

---

[8] Kentucky Rule of Evidence.

6

from her drug addiction, the lifesaving actions she administered to Jaxon, her admissions to police officers, and her remorse are all indicators that she did not display an extreme indifference to human life.

Baker moved for a directed verdict of acquittal at the close of the Commonwealth's case-in-chief and renewed the motion at the close of her case-in-chief. *Ray v. Commonwealth*, 611 S.W.3d 250, 266 (Ky. 2020). The trial court denied the motion because there was evidence that Baker was aware of the dangers of fentanyl, and her toddler was somehow able to ingest her fentanyl due to her actions. Thus, the trial court found that there was sufficient evidence for the case to go to the jury. On a motion for directed verdict of acquittal

> [t]he trial court must draw all fair and reasonable inferences from the evidence in favor of the Commonwealth. If the evidence is sufficient to induce a reasonable juror to believe beyond a reasonable doubt that the defendant is guilty, a directed verdict should not be given. For the purpose of ruling on the motion, the trial court must assume that the evidence for the Commonwealth is true, but reserving to the jury questions as to the credibility and weight to be given to such testimony.

*Commonwealth v. Benham*, 816 S.W.2d 186, 187 (Ky. 1991). A reviewing court must determine "if, under the evidence as a whole, it would be clearly unreasonable for a jury to find guilt, only then is the defendant entitled to a directed verdict of acquittal." *Id.*

An individual is guilty of wanton murder when she causes the death of another person "by wantonly engag[ing] in conduct creating a grave risk of death to another person under circumstances manifesting extreme indifference

7

to human life." *Elliot v. Commonwealth*, 976 S.W.2d 416, 418 (Ky. 1998); KRS[9] 507.020(1)(b).  A person acts wantonly

> with respect to a result or to a circumstance described by a statute defining an offense when he is aware of and consciously disregards a substantial and unjustifiable risk that the result will occur or that the circumstance exists.  The risk must be of such nature and degree that disregard thereof constitutes a gross deviation from the standard of conduct that a reasonable person would observe in the situation.  A person who creates such a risk but is unaware thereof solely by reason of voluntary intoxication also acts wantonly with respect thereto.

KRS 501.020.

Wantonness alone does not rise to the level of the culpable mindset of intent needed for murder—there must also be a determination that the circumstances around a person's wanton conduct amounted to an extreme indifference to human life.  *Brown v. Commonwealth,* 174 S.W.3d 421, 425 (Ky. 2005); *see also McGinnis v. Commonwealth,* 875 S.W.2d 518, 520 (Ky. 1994) (holding the culpable mindset of wantonness is enough to prove second-degree manslaughter, but a conviction of murder also requires circumstances manifesting extreme indifference to human life).  Determining if the level of wantonness perpetrated by the defendant rises to the level of extreme indifference to human life is a question left to the jury.  *Cook v. Commonwealth,* 129 S.W.3d 351, 363 (Ky. 2004); *Brown,* 174 S.W.3d at 426-27.

---

[9] Kentucky Revised Statute.

Extreme indifference to human life does not have a precise definition but has been described as when there is (1) an exceptionally high risk of homicide; (2) when there are "circumstances known to the actor that clearly show awareness of the magnitude of the risk;" and (3) when there is "minimal or non-existent social utility in the conduct." *Brown v. Commonwealth*, 975 S.W.2d 922, 924 (Ky. 1998). "Such conduct plainly reflects more than mere awareness and conscious disregard of a substantial and unjustifiable risk of death. It manifests a high disregard for life and evinces what the common law chose to call a depravity of mind or heart." *Id.* (quoting Robert G. Lawson & William H. Fortune, *Kentucky Criminal Law*, § 8-2(c)(2), at 322 (1998)). For example, the defendant in *Brown* hit an oncoming car, killing one of the car's passengers, when he knowingly drove through a red light while watching T.V. on the two monitors he had mounted in his car, "one on the automatic transmission gearshift, and the other in the passenger-side dashboard." *Brown*, 174 S.W.3d at 424, 426-27. It was determined that the circumstances surrounding the defendant's conduct rose to the level of extreme indifference to human life, because there is no social utility in driving while watching T.V. *Id.*

In the case at bar, it cannot be said that a reasonable juror would believe Baker's wanton actions did not manifest an extreme indifference to human life. Baker knew that fentanyl was dangerous enough to cause death—she stated in her interview that was the reason she kept Narcan® in the house, as she had previously used it on Edwin when she thought he overdosed. Additionally, Jaxon's toxicology lab report revealed that his fentanyl concentration was

9

almost ten times the fentanyl concentration that could potentially kill an adult human. And yet, knowing the extreme dangers fentanyl posed to grown adults, she decided to store it in a place where her toddler could apparently access it.

Jaxon, like most two-year olds, was curious. Baker stated in her interview with police that a year before his death, Baker found Jaxon playing with a burnt spoon which had been used to prepare solid fentanyl for injection. She also told police that she knew Jaxon could get behind her bed, where she kept her fentanyl, because she had just seen him there the day before he died. Instead of changing how she stored her fentanyl, she only pushed the bed closer to the wall so Jaxon could not go around the back of the bed. However, even if he was unable to get behind the bed, Baker agreed with the police that Jaxon could have pulled her purse through the bars of her iron headboard without having to go behind her bed. Baker did not think Jaxon could use the zipper of the purse she kept the fentanyl in, but only because she had never seen him do that before. Nevertheless, Baker knew the high risk of death posed by ingesting fentanyl and failed to sufficiently store it out of reach of her two-year old son.

In addition to the fentanyl located in her purse, there was also other paraphernalia found in her bedroom, including: syringes, caps used to prepare the fentanyl for injection, a scale, another package of Narcan®, a pipe, and materials used to create filters for pipes used to smoke substances. Not only did Baker store her fentanyl in the bedroom she at times shared with Jaxon, but she stored an assortment of dangerous materials in the room, as well. The

10

circumstances encompassing Jaxon's death included a high risk of homicide, where Baker was acutely aware there was a high chance of death, and there was no social utility in her actions. *Brown*, 975 S.W.2d at 924.

Ultimately, it was the jury's duty to determine whether or not the evidence presented about the circumstances surrounding Jaxon's death manifested an extreme indifference to human life. *Ramsey v. Commonwealth*, 157 S.W.3d 194, 197 (Ky. 2005) (determining that the defendant had manifested other dangerous behavior and "a jury could reasonably conclude the defendant was driving so wantonly as to manifest extreme indifference to human life."). Under the evidence as a whole, the jury could have reasonably inferred that Jaxon's death was a manifestation of extreme indifference to human life and find Baker guilty of wanton murder. Therefore, the trial court did not err when it denied Baker's motion for a directed verdict.

Baker contends that the Commonwealth erred when it told the jury in its closing argument to disregard the help Baker administered to Jaxon, her love for Jaxon, and her guilt over his death when coming to its decision. Baker failed to object to the Commonwealth's statements at trial, and has asked the Court to review this argument for palpable error under RCr[10] 10.26 which provides:

> A palpable error which affects the substantial rights of
> a party may be considered by the court on motion for a
> new trial or by an appellate court on appeal, even
> though insufficiently raised or preserved for review,
> and appropriate relief may be granted upon a

---

[10] Kentucky Rule of Criminal Procedure.

11

> determination that manifest injustice has resulted from the error.

"A palpable error must be so grave in nature that if it were uncorrected, it would seriously affect the fairness of the proceedings." *Brewer v. Commonwealth*, 206 S.W.3d 343, 349 (Ky. 2006).

"[A] prosecutor is permitted wide latitude during closing arguments and is entitled to draw reasonable inferences from the evidence." *Commonwealth v. Mitchell*, 165 S.W.3d 129, 132 (Ky. 2005). "The longstanding rule is that counsel may comment on the evidence and make all legitimate inferences that can be reasonably drawn therefrom." *Padgett v. Commonwealth*, 312 S.W.3d 336, 350 (Ky. 2010) (citing *East v. Commonwealth*, 249 S.W.2d 137, 139 (Ky. 1933)). The Commonwealth may respond to defense counsel's comments in its closing argument, as long as it does not "derogate from a fair and impartial criminal proceeding." *Commonwealth v. Mitchell*, 165 S.W.3d 129, 133 (Ky. 2005). Here, the Commonwealth's statements in its closing argument were all addressed during trial and argued by defense counsel during its opening and closing statements when it asserted the actions taken by Baker demonstrated she could not have acted with an extreme indifference to the value of human life. The Commonwealth was within its confines by responding to defense counsel, and there was no manifest injustice created by the Commonwealth's comments during closing arguments. Therefore, we find no palpable error.

12

**B. The trial court did not err when it allowed the Commonwealth to cross examine Baker's expert witness about certain CHFS records. The trial court did err when it failed to admonish the jury pursuant to KRE 703(b), but the error was harmless.**

Baker argues that the trial court erred when it allowed reference to information contained in records from the CHFS during cross-examination of her expert witness, Dr. Clark. Prior to trial, the Commonwealth filed a KRE 404(c) notice offering the contents of the records that it believed would be relevant to prove Baker's wantonness and extreme indifference to human life. The Commonwealth also noted the records would be relevant to show Baker's general knowledge of drugs and an absence of mistake or accident. In response to the notice, Baker argued that the records were inadmissible character evidence. The Commonwealth had submitted no information about what records would be used, the records went back almost 15 years prior to the events of trial, and the information would be duplicitous because Baker had already admitted in her interview with police that she knew the dangers of fentanyl. Baker argued that any probative value provided by the records did not outweigh their prejudicial value.

The trial court held a pre-trial hearing to discuss the records. The Commonwealth argued that the records went to Baker's extreme indifference to the value of human life—they demonstrated that she was advised to lock her drugs up and by not doing this showed she generally did not follow counseling on drug exposure. Baker argued the records were riddled with irrelevant information and that the Commonwealth needed to specify which records it

13

intended to rely upon. The trial court agreed with Baker and requested that the Commonwealth narrow down the records it intended to use.

Another hearing was held once the Commonwealth narrowed the records down. Baker again objected to any admission of the records because they reflected events that were not relevant to the ultimate issue at trial. The Commonwealth argued again that the records went to Baker's wantonness. The trial court found that the records were relevant to show Baker's knowledge of drugs and her wanton conduct, thus denying Baker's motion to exclude the records. The Commonwealth notified the trial court and Baker that it did not intend to introduce the records in its case-in-chief but reserved the right to use the records during its cross-examination of Dr. Clark.

Baker filed a notice pertaining to Dr. Clark's expert testimony which listed the records as part of the materials she had received to review in preparation for an upcoming hearing pursuant to *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). During the hearing, Dr. Clark testified that she relied on the records, among the other materials she was provided, to render Baker's OUD diagnosis. The Commonwealth pursued cross-examination of Dr. Clark with the records, and Baker objected as the records were irrelevant to whether or not Dr. Clark's expert opinions were trustworthy under *Daubert*. The trial court overruled the objection and allowed the Commonwealth to cross-examine Dr. Clark with the records because she stated she relied on them to form her opinions.

14

At trial, the records were discussed before the Commonwealth began its cross-examination of Dr. Clark. The Commonwealth told the trial court it sought to cross-examine Dr. Clark about the records, as some of her testimony was contradictory to information included in the records, and it would keep its cross-examination limited to that information. Baker objected and argued that the records were not relevant to Dr. Clark's three limited opinions at trial and that she had not relied upon the records to form them for trial. Her opinions at trial were that Baker suffered from OUD, Baker was not receiving proper methadone treatments, and there is a stigma around OUD. The Commonwealth reasoned that it was allowed to cross-examine Dr. Clark about what she reviewed for Baker's case in total. The records were indicated in the notice defense counsel originally filed about Dr. Clark's testimony and Dr. Clark testified during the *Daubert* hearing that she relied on them for her opinions. The trial court overruled Baker's objection to the records in general but reserved ruling on the specific records until the Commonwealth began its cross-examination of Dr. Clark.

The Commonwealth introduced three lines of questioning with the use of the records in its cross-examination. It began by asking Dr. Clark if she had reviewed Cabinet records from dating back to 2013 to prepare for trial:

> **Commonwealth**: You reviewed a number of different Cabinet records going back as far as 2013, correct?
>
> **Dr. Clark**: No, it would go back further than that.
>
> **Commonwealth**: Well, they make references to issues, events, interventions, whatever you want to call it, interactions with the Cabinet all the way back to 2004, correct?

15

**Dr. Clark**: Right, when [Baker] was a juvenile.

**Commonwealth**: And the records from 2013 on make reference to events or records going all the way back to 2004?

**Dr. Clark**: I think 2004 sounds right.

**Commonwealth**: So, we know she's been involved with the Cabinet about that long.

**Dr. Clark**: Well, it was her mother that was involved with the Cabinet then in 2004 but yes.

**Commonwealth**: Okay but that would have included [Baker] as well, correct?

**Dr. Clark**: Yes, she was intoxicated, she came into the emergency room with her mother, so the Cabinet was involved.

**Commonwealth**: Okay and I think you said, correct me if I'm wrong, on direct that she was using methadone since 2013.

**Dr. Clark**: No, I believe it was around 2007.

**Commonwealth**: Oh, so it's even longer.

**Dr. Clark**: On and off . . . I might be wrong it might be 2008 but around there.

This testimony did not elicit a specific objection from Baker.

Second, the Commonwealth asked Dr. Clark if she recalled reviewing a record that indicated that Baker had participated in a parenting class called "Parenting Under the Influence." Baker objected to this question, and again objected to the relevancy of the records considering Dr. Clark's limited opinions and the age of the records. The Commonwealth argued that the question about parenting classes related to Dr. Clark's opinion on stigma surrounding OUD. The trial court determined that the line of questioning went to Baker's knowledge and state of mind, and overruled Baker's objection. The Commonwealth continued with its line of questioning:

16

**Commonwealth**: She has had multiple parenting classes as documented by the records you reviewed is that correct?

**Dr. Clark**: I don't recall multiple parenting classes. I recall that she was in intensive outpatient, I recall that she had absolutely pristine drug screens when she was being monitored by the Cabinet, I recall the home visits where the social workers talked about the good bonding that they have, and the home was clean and the children are doing well—those kinds of things. But I don't recall specific parenting classes or how often those things would occur.

**Commonwealth**: Would you agree with me that there was more than one?

**Dr. Clark**: No, again I don't recall the pieces of psychosocial intervention she got.

Lastly, the Commonwealth asked Dr. Clark if she had reviewed records

demonstrating that Baker had received education pertaining to proper

methadone storage:

**Commonwealth**: Do you recall documents recording Lauren Baker receiving counseling on keeping her methadone in a locked container?

**Dr. Clark**: No, I don't remember that particular piece, but that is something that I always require when I had patients getting take home methadone, which she was not.

**Commonwealth**: Can you look at this document and tell me if you recognize it as one of the documents you reviewed?

**Dr. Clark**: I don't recall the specific page, but I'll believe it's part of the record.

**Commonwealth**: Okay and is there a reference in that documentation that Lauren Baker got counseling on keeping methadone in a locked container?

**Dr. Clark**: Yes.

**Commonwealth**: Okay so obviously she was receiving take home methadone at some point or else there would be no reason to counsel her.

17

**Dr. Clark**: I don't know because I don't think this was part of her medical record, so I don't know if she was getting take homes at that point or not.

**Commonwealth**: Okay but it is part of the record you reviewed in coming to your opinions here today, correct?

**Dr. Clark**: I reviewed the Cabinet records, they are supportive of my opinions, but I did not rely on them as I did with the other things we discussed earlier.

Baker did not object to this specific line of questioning.

At the conclusion of Dr. Clark's testimony, Baker requested an admonition pursuant to KRE 703(b) regarding the Commonwealth's use of the records during its cross-examination. The trial court refused to admonish the jury because it determined that Dr. Clark had relied on the records previously, and they were relevant to her opinions.

On appeal, Baker argues that the records should not have been disclosed on cross-examination because they were irrelevant to showing Baker's wantonness and to Dr. Clark's opinions at trial. She asserts that the jury was not assisted by the knowledge that Baker was involved with the Cabinet because the Commonwealth did not give any context to the records. Baker claims that the records only produced evidence that purposefully painted her in a bad light. Furthermore, she argues that Dr. Clark never stated that she relied on the records during direct examination, which should have precluded the Commonwealth from cross-examining her with the records.

Witnesses generally "may be cross-examined on any matter relevant to any issue in the case, including credibility. In the interests of justice, the trial court may limit cross-examination with respect to matters not testified to on

18

direct examination." KRE 611(b). Even so, Kentucky embodies a "wide open" precept of cross-examination therefore "permitting the inquiry on cross to extend to the full limits of the dispute . . . unaffected by the content of the direct testimony of the witness under cross-examination." *Commonwealth v. Armstrong*, 556 S.W. 595, 599-600 (Ky. 2018) (quoting Lawson, *The Kentucky Evidence Law Handbook*, § 3.20(2)(c) (5th ed. 2013)).

A trial court's evidentiary ruling is reviewed for abuse of discretion. *Clark v. Commonwealth*, 567 S.W.3d 565, 576 (Ky. 2019). A trial court abuses its discretion when its decision is "arbitrary, unreasonable, unfair, or unsupported by sound legal principles." *Commonwealth v. English*, 993 S.W.2d 941, 945 (Ky. 1999).

1. **The trial court did not err when it allowed the Commonwealth to use the CHFS records during its cross-examination of Dr. Clark.**

Baker argues that the use of the records on cross-examination should have been barred under KRE 703 because the records were irrelevant to showing Baker's wantonness and to Dr. Clark's opinions at trial. The Commonwealth contends that the records were entirely relevant to Baker's knowledge of drugs and Dr. Clark's opinions at trial, specifically her opinion about stigma.

KRE 703(a) provides that an expert can base their opinion or inference about a particular case on information that is made known to her at or before a hearing. Additionally, that information does not have to be admissible in evidence if it is "of a type reasonably relied upon by experts in the particular

19

field in forming opinions or inferences upon the subject." KRE 703(a).

Pursuant to subsection (b) of the rule

> if an expert relied on otherwise inadmissible evidence in forming their opinion, that evidence can come in as a means to challenge the validity and probative value of that expert's opinion. However, that evidence may only be admitted if the trial court determines that the evidence was "trustworthy, necessary to illuminate testimony, and unprivileged."

*Exantus v. Commonwealth*, 612, S.W.3d 871, 900-01 (Ky. 2020) (quoting KRE 703(b)). Lastly, KRE 703(c) provides that "[n]othing in this rule is intended to limit the right of an opposing party to cross-examine an expert witness or to test the basis of an expert's opinion or inference."

In Baker's case, the Commonwealth was within KRE 703's confines to cross-examine Dr. Clark on "the full limits of the dispute" about what it believed to be information pertaining to Dr. Clark's credibility or her opinions. KRE 611. In the small discussions pertaining to the records, the Commonwealth asserted they were used to challenge Dr. Clark's opinion that Baker had specifically suffered from the stigma surrounding OUD by showing she had received education about her disease. Furthermore, the records did not need to be admissible in order to be disclosed to the jury—in fact, the Commonwealth never moved to enter the records into evidence, it only discussed the records with Dr. Clark. KRE 703(a) & (b). The jury never had access to the records during its deliberation. The language of KRE 703(c) specifically provides that nothing in the rule should be read to constrain the cross-examination of an expert.

20

The Commonwealth actually spent much of its cross-examination of Dr. Clark focused on Baker's records from New Season Covington Metro Treatment Center, discussing the amount of times Baker missed her methadone treatment and how that could affect her recovery process. Therefore, even if it was error to examine the records on cross-examination, that error was harmless because the records constituted a small amount of the discussion during cross-examination. *See* RCr 9.24.

Baker argues that the trial court should have determined if the records were "trustworthy, necessary to illuminate testimony, and unprivileged" before allowing the Commonwealth to cross-examine Dr. Clark with them and disclosing the information they contained to the jury. Baker failed to preserve this specific issue for appellate review and has asked us to review it for palpable error pursuant to RCr 10.26.

In *Exantus v. Commonwealth*, this Court examined KRE 703 and determined that a trial court should strictly adhere to the language provided in KRE 703(b), because that language "is the only safeguard provided in the rule against the erroneous admission of otherwise inadmissible evidence." 612 S.W.3d at 901. The inadmissible evidence at issue in *Exantus* was KRE 404(b) character evidence of a prior bad act where the defendant shook his infant daughter resulting in physical injury. *Id.* at 898. However, the prior bad act had been introduced to challenge the basis of the expert's conclusion that the defendant had no prior criminal history, which was part of the information the

21

expert used in forming his opinion that the defendant was legally insane. *Id.* at

901. In addition,

> [the defendant] was found not guilty by reason of insanity of the
> capital offense of murder and the aggravating offense of first-degree
> burglary. And, he was found guilty but mentally ill of three
> assaults. It is therefore clear that the evidence at issue did not
> have an unduly prejudicial effect on the jury, and his convictions
> should stand.

*Id.* Therefore, while the trial court did err by failing to determine the

trustworthiness, necessity, and unprivileged status of the prior bad act, this

Court affirmed the defendant's conviction of not guilty by reason of insanity of

one count of murder because the error was not unduly prejudicial.[11]

On review for palpable error, we cannot say that the trial court's failure

to find the records to be trustworthy, necessary, and unprivileged was so

egregious that there would be "a substantial possibility that the result in the

case would have been different without the error." *Brewer,* 206 S.W.3d at 349

(quoting *Schoenbachler v. Commonwealth,* 95 S.W.3d 830, 836 (Ky. 2003)); *see*

*also Abernathy v. Commonwealth,* 439 S.W.2d 949, 952 (Ky. 1969), *overruled in*

*part on other grounds by Blake v. Commonwealth,* 646 S.W.2d 718 (Ky. 1983).

Here, the Commonwealth stated it used the records to test Dr. Clark's

opinion about stigma and to show Baker knew drugs were dangerous. The

records showed Baker had at some point received education pertaining to drug

storage. That information goes to Dr. Clark's testimony that Baker experienced

---

[11] The defendant had also been found not guilty by reason of insanity of one
count of first-degree burglary, guilty but mentally ill of two counts of second-degree
assault, and guilty but mentally ill of one count of fourth-degree assault.

stigma due to her OUD diagnosis—she was receiving help and education on her disease. While the Commonwealth's dive into Baker's knowledge might be cumulative as Baker had already admitted in her interview that she knew drugs were dangerous, it certainly was not so egregious that it seriously affected the fairness of Baker's trial. *Brewer*, 206 S.W.3d at 349. Dr. Clark refuted the Commonwealth's cross-examination when she testified that she could not recall certain things pertaining to the records. Furthermore, the Commonwealth cross-examined Dr. Clark substantially on other matters—the records were not the main focus of the testimony.

Although Baker failed to object to this particular line of questioning, she contends that the most harmful questions posed by the Commonwealth pertained to the alleged education she received pertaining to locking methadone away and it should have been barred. Sound judgment would dictate that a reasonable juror would know to keep her fentanyl away from her child to the best of her capabilities, which would be to lock it away, without having to be told. The Commonwealth's line of questioning pertaining to correct drug storage did not introduce any information that the jury would not have already known. We cannot say that the trial court's failure to assess the trustworthiness, necessity, and unprivileged status of the records "involve[d] prejudice more egregious than that occurring in reversible error[.]" *Brewer*, 206 S.W.3d at 349. Therefore, we find no palpable error.

## 2. The trial court erred when it did not admonish the jury pursuant to KRE 703(b), but the error was harmless.

Baker argues the trial court erred when it denied Baker's request for a KRE 703 admonishment concerning the records. At the close of Dr. Clark's testimony, Baker requested that the trial court admonish the jury pursuant to KRE 703(b), which provides that "[u]pon request the court **shall** admonish the jury to use such facts or data only for the purpose of evaluating the validity and probative value of the expert's opinion or inference." (emphasis added). The trial court responded that, in its opinion, it did not have to admonish the jury if it did not agree with the defense's argument in favor of the admonishment, and it determined that the records were relevant and pertinent to what Dr. Clark reviewed to formulate the opinions she gave at trial. Therefore, the trial court did not admonish the jury.

A court is to give effect to the General Assembly's intent and is not "at liberty to add or subtract form the legislative enactment or discover meanings not reasonably ascertainable from the language used." *Richardson v. Commonwealth*, 645 S.W.3d 425, 433 (Ky. 2022) (quoting *Commonwealth v. Harrelson*, 14 S.W.3d 541, 546 (Ky. 2000)). The term "shall" in KRE 703(b), and any other statute, is mandatory language, as defined by KRS 446.010(2). *See also Fox v. Grayson*, 317 S.W.3d 1, 13 (Ky. 2010). Therefore, based on the mandatory language in KRE 703(b), the General Assembly intended for courts to render the specified admonishment when requested. A court should not disregard facially mandatory language provided in a statute just because it

24

does not agree with the direction of the statute. The trial court thus erred when it did not admonish the jury upon Baker's request.

However, the error was harmless. Pursuant to RCr 9.24, there is

> [n]o error in either the admission or the exclusion of evidence and no error or defect in any ruling or order, or in anything done or omitted by the court or by any of the parties, is ground for granting a new trial or for setting aside a verdict or for vacating, modifying or otherwise disturbing a judgment or order unless it appears to the court that the denial of such relief would be inconsistent with substantial justice. The court at every stage of the proceeding must disregard any error or defect in the proceeding that does not affect the substantial rights of the parties.

Here, the trial court's error was not so great as to affect Baker's substantial rights. The evidence put forth by the Commonwealth had already exhibited that Baker knew how dangerous fentanyl was but nonetheless kept her fentanyl in a place easily accessible to her child—the information presented to the jury from the records was not so significant as to determine the outcome of the trial. While the trial court should have followed the mandatory language provided in KRE 703(b), its failure to admonish the jury was not inconsistent with substantial justice.

### C. The trial court did not err when it denied instructing the jury on reckless homicide.

Baker next argues that the trial court erred when it did not instruct the jury on reckless homicide. The trial court stated it would not issue the instruction because Baker knew the dangers of fentanyl and an instruction for reckless homicide "implies that you don't have an understanding really of the risk." The trial court instructed on wanton murder and second-degree manslaughter.

25

A trial court's failure to give an instruction is reviewed for an abuse of discretion. *Commonwealth, v. Caudill*, 540 S.W.3d 364, 367 (Ky. 2018). A trial court has abused its discretion when its

> decision was arbitrary, unreasonable, unfair, or unsupported by sound legal principles. Additionally, while it is the duty of the trial court to prepare and give instructions on the whole law of the case, a lesser-included offense instruction is not proper simply because a defendant requests it. An instruction on a lesser included offense is required only if, considering the totality of the evidence, the jury might have a reasonable doubt as to the defendant's guilt of the greater offense, and yet believe beyond a reasonable doubt that the defendant is guilty of the lesser offense.

*Pozo-Illas v. Commonwealth*, 671 S.W.3d 118, 136 (Ky. 2023); *see also Harris v. Commonwealth*, 313 S.W.3d 40, 50 (Ky. 2010). The duties of a trial court do not include instructing "on theories of the case that are not supported by the evidence." *Sanders v Commonwealth*, 301 S.W.3d 497, 500 (Ky. 2010).

"A person is guilty of reckless homicide when, with recklessness he causes the death of another person." KRS 507.050(1). To act with recklessness means that a person

> fails to perceive a substantial and unjustifiable risk that the result will occur or that the circumstance exists. The risk must be of such nature and degree that failure to perceive it constitutes a gross deviation from the standard of care that a reasonable person would observe in the situation.

KRS 501.020(4).

Here, the evidence could not reasonably support that Baker failed "to perceive a substantial and unjustifiable risk that the result will occur or that the circumstance exists," because she stated in a police interview that was

played during trial that she knew how dangerous fentanyl could be. KRS 501.020(4). Despite the dangers, Baker kept her fentanyl in her bedroom behind her bed—a place where she had seen Jaxon reach just days prior to his death. Baker stated that she thought her way of storing the drugs was enough to keep her children out of them, but it is the effort Baker took to keep her drugs away from them that best exemplifies her understanding of the risk the fentanyl posed. Baker even concedes on appeal that the precautions she took indicated her understanding of the risk. Thus, the evidence did not support a jury instruction on reckless homicide.

Moreover, the jury in Baker's case was instructed on the lesser-charge second-degree manslaughter, but given the evidence, chose to impose the wanton murder conviction. Logic follows that if the jury chose not to impose the second-degree manslaughter charge, which required finding Baker acted wantonly but without extreme indifference to the value of human life, it would not have found her guilty of the lesser crime, reckless homicide, which only required a finding that she acted recklessly. Therefore, even if we determined the trial court erred when it did not instruct the jury on reckless homicide, it would have been a harmless error. *See* RCr 9.24.

### D. None of the errors Baker raised should result in cumulative and reversible error.

Lastly, Baker contends that her conviction of wanton murder should be reversed on the basis of cumulative error, which provides that multiple individually harmless errors may constitute reversible "if their cumulative effect is to render the trial fundamentally unfair." *Brown*, 313 S.W.3d at 631. Here,

27

none of the individual errors rise to the level of prejudice. *Furnish v. Commonwealth*, 95 S.W.3d 34 (Ky. 2002) (holding that adding up the absence of prejudice does not therefore create prejudice). As such, there is no cumulative error in need of reversal. *Brown,* 313 S.W.3d at 631.

### III.   CONCLUSION

For the foregoing reasons, we affirm.

All sitting. All concur.

COUNSEL FOR APPELLANT:

Jennifer Wade
Assistant Public Advocate

COUNSEL FOR APPELLEE:

Russell Coleman
Attorney General

James Havey
Assistant Solicitor General